Carlos SANTANA, Appellant,

v.

The STATE of Texas, Appellee.

No. 68930.

Court of Criminal Appeals of Texas,
En banc.

April 9, 1986.

Donald W. Rogers, Jr. (court appointed), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and J. Sidney Crowley, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is an appeal from a conviction for capital murder. Punishment was assessed at death.

On April 21, 1981, Olivero Flores, a driver for the Purolator Armored Company, was shot and killed during the course of a robbery. The evidence adduced at trial

showed that the deceased and his partner Dorothy Wright were making their last stop of the day at a Sage department store at approximately 12 noon on a Tuesday. The deceased drove their Purolator van into the Sage parking lot and parked immediately in front of the main entrance to the store. While Wright waited inside the van, the deceased exited from the driver's side of the van and began walking around the front of the van and into the store. Two armed men (one with a shotgun and one with a pistol) were waiting by a car parked immediately beside the entrance of the store. As the deceased walked towards the store, shots rang out one of which hit the deceased. No one saw who fired the fatal shot. Witnesses testified that immediately thereafter the two men began shooting at the van, riddling it with gunfire. They eventually broke the window on the driver's door, climbed into the van and ordered Wright to exit the van. The two robbers then drove off with the van. They were apprehended approximately an hour after the offense, just a short distance away from the scene.

In three grounds of error, appellant raises challenges to the sufficiency of the evidence. In order to answer his contentions we now summarize in detail the evidence adduced at trial. Dr. Aurelio Espinosa, the deputy chief medical examiner for Harris County, testified that he performed an autopsy on the deceased. He testified that the deceased died as a result of a gunshot wound to the chest. Dr. Espinosa further testified that the wound was consistent with that made by a bullet fired from a hand gun or a rifle. He testified that the only way the wound could have been made with a shotgun was if the shotgun shell had contained only a single pellet.

Dorothy Wright testified that she was working as the deceased's partner on the day of the offense. When the Purolator van pulled into the Sage parking lot, she was working in the rear of the van completing paper work and the deceased was driving the van. As was their usual custom, the deceased parked the van immediately in front of the main entrance to the Sage store. The deceased exited the van and Wright watched him walk around the front of the van and towards the door of the store. Wright testified that she heard someone say "halt." She looked in the direction of the voice and saw two men dressed in green fatigues and holding guns, standing behind a car that had parked in the first parking space to the right of the main entrance to the store. Wright heard two gunshots and saw the deceased fall to the ground. One of the men walked over to the deceased and looked at him and then raised his gun and began to shoot at the van. Wright testified she became frightened and laid down on the floor of the van. During the next few minutes the van was riddled with gunshots. Finally, the shooting stopped and Wright heard a voice say, "Bitch, open the door." Still frightened she remained on the floor. Soon Wright heard some beating on the driver's side window. The beating continued until the glass broke and Wright saw one person enter the van. She was ordered to leave the van or be killed. Wright exited the van via the double doors on the passenger side of the van and with hands held above her head she walked into the Sage store. After reaching the store, she turned around and saw a man with a pistol sitting in the passenger side of the van. Wright testified that she had never been able to identify any one in connection with the offense nor did she know which man shot the deceased. Finally she testified that she was not sure that the man who first had the pistol was the same man who had the pistol when she exited the van.

Joseph Hassell, an investigator for the Sage store chain testified that he was working inside the store office on the day of the offense. He heard someone calling for the police so he and three other store investigators left the office and entered the main part of the store to ascertain the problem. When they reached the main part of the store he heard four gunshots. Hassell related that he ran to another store exit near where his car was parked. When he ran outside he saw the Purolator van

parked in the parking lot and a man holding a shotgun standing next to the van. Hassell watched as the man first fired his gun into the van and then shouted at the individual inside the van. Finally Hassell saw the man take the butt of the shotgun and try to break the window out on the driver's side of the van. Hassell retrieved his handgun from his car and then ran back inside the store. When he reached the main door, he saw a second man holding a pistol on the female Purolator guard. She had exited the van and was walking toward the store entrance with her hands held above her head. Suddenly the van started to pull away and the man with the pistol jumped into the rear door on the passenger side of the van. The van drove off slowly. Hassell attempted to follow the van in his own car but lost the van in the traffic. Hassell identified the appellant as the man he saw holding the shotgun.

Lester Allen Jackson, the owner of a linen service, testified that he was making a delivery to a pool room located directly across a drainage ditch from the Sage store. As he was walking out of the pool room he heard three pistol shots in rapid succession and then one shotgun blast. He jumped in his truck and drove in the direction of the gunshots. When he reached the front of the Sage store, he saw the Purolator van parked in front of the store and a person lying on the ground. A man with a pistol was attempting to break his way into the van. When he was unsuccessful he called over a second man who was holding the shotgun. The second man took the butt of the shotgun and used it to break the window in the driver's door. The man with the pistol then reached inside the window and opened the door. Both men climbed into the van. Jackson testified that soon he saw Wright exit the van and walk towards the Sage store with her hands in the air. At the same time he saw a man with a shotgun run to the front of the van and rest the shotgun on the hood of the van as though he was keeping watch for his partner. After a brief time both men jumped into the van and the van began to slowly drive off. As the van passed

Jackson he could see a man with the shotgun trying to close the rear passenger door which appeared to be jammed. Jackson testified that the man holding the shotgun at that time had not been the same man he had seen with the shotgun earlier. Jackson also testified that it appeared that the man with the shotgun also had a pistol stuck in his belt. Finally Jackson identified the man with the shotgun as the appellant.

David Pena testified that he was the owner of a jewelry store whose rear door looks out on the Sage parking lot. He testified that on the day of the offense he was in his store when he heard gunshots. He ran to his back door and saw two armed individuals in the Sage parking lot, one with a shotgun and one with a pistol. Pena went and got his own shotgun and then ran back to the door. He watched as the two men broke into the van. As the van began to move slowly towards the Gulf Freeway Pena ran to the front of his store where his pickup was parked so he could follow the van. However, when he came out the front door of his store, the van was passing directly in front of his store. Pena was able to observe the individual sitting on the passenger side of the van very closely. He testified that this was the same man he had seen holding the pistol earlier. He identified this individual as appellant's co-defendant, Meanes. Pena testified that he jumped in his pickup truck and tried to follow the van. However he lost the van in the traffic. Pena flagged down a passing policeman and reported the incident.

Sergio Ramirez testified that he worked in the store adjacent to Pena's store. His view of the events was similar to Pena's. He testified that after hearing gunshots he too looked out of the rear door of his store. He saw both the man carrying the shotgun and the man carrying the pistol shooting at the van. Both men then attempted to break the driver's side window and finally the man carrying the shotgun was successful in breaking the glass. Ramirez saw the van drive out of the parking lot. He too ran to the front entrance of his store and saw the van as it passed by. The man who

had been holding the pistol was sitting on the passenger side of the van and Ramirez also identified this individual as being appellant's co-defendant, Meanes.

Several other witnesses who were in and around the Sage store at the time of the offense described the events of the robbery-murder but none of them were able to identify the assailants.

Evidence was introduced that the two weapons used by the gunmen were owned by the appellant.

Houston police detective Hipolito Galano testified that he gave both appellant and his co-defendant their warnings immediately after their arrest. Galano further testified that appellant told him that initially he had been using the pistol but when his co-defendant had trouble working the shotgun, they exchanged weapons.

At the punishment phase of the trial, two witnesses testified that the appellant's reputation for being a peaceful and law-abiding citizen was bad. Evidence was also presented that after his arrest, appellant asked a friend of his, Jesus Mario Budria, to help him escape from jail by providing him with a gun and a car. The appellant told Budria that he was going to get on the roof of the jail, climb down a rope made of bed sheets and escape in a car which had been left on the street. Finally, another inmate of the county jail, James Paul Martin, testified that appellant was part of a group of inmates that attempted to escape from the Harris County Jail. According to Martin, the inmates armed with a fully loaded .22 caliber Baretta automatic pistol, two homemade knives and a cannister of tear gas, planned to take a guard hostage and make their way from the sixth floor of the Harris County Jail to the basement entrance of the jail. When the inmates reached the booking desk in the basement of the jail, they planned to storm the desk, disarm the officers working there and steal more weapons which were kept in a locked drawer. They also planned to take Lt. Ruth Lucas, the night supervisor of the jail, as an additional hostage. The inmates then planned to exit into the jail parking garage, steal several cars and flee. The plan was thwarted when Martin notified sheriff's officers of the impending escape. Martin testified that immediately prior to the attempted escape, he saw appellant in possession of both a homemade knife and the pistol. A search of the cell block in which appellant and the other inmates were housed revealed a .22 caliber Baretta automatic pistol, two homemade knives and a can of tear gas.

Article 37.071(b), V.A.C.C.P., provides that during the punishment phase of a capital murder trial certain special issues must be submitted to the jury. The first special issue reads as follows:

> "(1) whether *the conduct of the defendant that caused the death of the deceased* was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; ..." (emphasis added)

■ In his second ground of error, appellant argues that the evidence is insufficient to support the jury's affirmative answer to the first special issue submitted to the jury during the punishment phase of the trial in that there is no evidence whatsoever of any "conduct of the defendant that caused the death of the deceased." Appellant argues that the case of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) prohibits the infliction of the death penalty in the instant case because there was no direct evidence that he was the actual killer and *Enmund* stands for the proposition that the law of parties cannot be applied at the punishment stage. We addressed this contention in the case of appellant's co-indictee:

> "Underlying appellant's entire thesis is a fundamental misapprehension of *Enmund*. *Enmund* does not prevent, under all circumstances, imposition of the death penalty against one convicted, as a party, of capital murder. *Enmund* prohibits assessment of the death penalty against any defendant who did not kill, attempt to kill, or intend or contemplate that life would be taken." *Meanes v.*

*State,* 668 S.W.2d 366, 375 (Tex.Cr.App. 1983).

The United States Supreme Court pointed this out in *Enmund* when they wrote:

"Enmund himself did not kill or attempt to kill; and as construed by the Florida Supreme Court, the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder." 102 S.Ct. at 3377

See also *Green v. State,* 682 S.W.2d 271, 286 (Tex.Cr.App.1984).

This Court considered a very similar contention in *Selvage v. State,* 680 S.W.2d 17, 21 (Tex.Cr.App.1984). In *Selvage,* the accused was charged with murdering a Harris County deputy sheriff during the robbery of a jewelry store. The evidence showed that the accused and a companion were involved in the robbery but there was no direct evidence as to which assailant fired the shot that killed the deceased. After the deceased had been shot, Selvage was seen bending over a broken jewelry case and removing its contents. When the store employees obtained their own guns and chased Selvage and his companion out to the parking lot, Selvage and his companion opened fire on the store employees. Thereafter a brief shootout ensued. After reviewing the record we found the evidence sufficient to support the jury verdict as to the first special issue. Specifically we held that Selvage

"... used lethal force to effectuate a safe escape and attempted to kill Ventura and Roberts as they pursued him and his companion from the jewelry store. Appellant's action indicate a reasonable expectation that the death of the deceased or another would result." 680 S.W.2d at 22

We find a similar situation in the instant case. Although there is no direct evidence which specifically shows that appellant fired the fatal shot, there is evidence before us which suggests that appellant fired the fatal shot. Furthermore, appellant's actions during the offense indicate that appellant had a reasonable expectation that the death of the deceased or another would result. Appellant's second ground of error is overruled.

■ In his third ground of error appellant argues that the evidence is insufficient to support his conviction under the law of parties. In its charge to the jury on guilt-innocence, the trial court instructed the jury as to the law of parties pursuant to V.T.C.A., Penal Code, Section 7.02(a)(2). That section provides:

"(a) A person is criminally responsible for an offense committed by the conduct of another if:

\*  \*  \*  \*  \*  \*

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; ..."

Appellant maintains that the State failed in meeting its burden under Section 7.02, supra, in that the State failed to prove any act on the part of appellant which would make him a party to the killing and thus the evidence is sufficient only to show his participation in the robbery.

In determining whether one participated as a party in committing an offense, the fact finder may look to events occurring before, during and after the offense and reliance may be placed on actions which show an understanding and common design to do a certain act. *Tarpley v. State,* 565 S.W.2d 525 (Tex.Cr.App.1978). However, mere presence alone will not be sufficient to show a defendant's guilt as a party to an offense. *Wygal v. State,* 555 S.W.2d 465 (Tex.Cr.App.1977).

In *Helms v. State,* 493 S.W.2d 227, 229 (Tex.Cr.App.1973), a case decided under the prior penal code, the accused was convicted of murder with malice. Evidence introduced at trial showed that the deceased was riding in a car with three other individuals. Shots were fired from the car causing the death of the deceased. Evidence showed that there were four guns in the car and the gun later identified as the murder weapon had specifically been given to the defendant a short time prior to the

shooting. On appeal the defendant argued that there was insufficient evidence to support a finding that he was acting as a principal at the time the deceased was killed in that there was no evidence that he actually fired the fatal shot. This Court rejected that argument and wrote:

"... However, he was placed at the scene along with the other defendants, by Williams' testimony. The accomplice witness testified that the defendants told her of 'some trouble with some Negroes,' obtained weapons and all left in one automobile. They returned together, seemed uneasy and listened to newscasts about a black woman being shot. *The fact that no one could testify as to who actually fired the fatal shot is of no consequence.* The jury had before it sufficient evidence that appellant encouraged and aided the commission of the offense in order to convict him as a principal." 493 S.W.2d at 229. (emphasis added)

We find the situation in the instant case analogous to the situation presented in *Helms.* Although there was no direct evidence that appellant fired the fatal shot, we find that there was sufficient evidence before the jury to support their guilty verdict. The State proved that both weapons used during the commission of the offense were owned by appellant. After the deceased was fatally shot, the appellant repeatedly fired his weapon at the Purolator van, inside of which the deceased's partner was hiding. Clearly, appellant's conduct showed him to be intimately involved in all aspects of this unprovoked, cold-blooded killing. The evidence is sufficient to show appellant's guilt as a party. Compare *Beal v. State*, 520 S.W.2d 907, 909 (Tex.Cr.App. 1975).

In his ninth ground of error, appellant contends the evidence is insufficient to support an affirmative answer to both special issues submitted to the jury during the punishment phase of the trial. Although this ground of error is multifarious, we will address the merits of appellant's claims.

■ As to the first special issue, appellant contends that the evidence is insuffi-cient to support a finding that appellant's conduct, which was not shown to have caused the death of the deceased, was deliberate. The evidence must be reviewed in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Article 37.071(b)(1), V.A.C.C.P., to have been proved beyond a reasonable doubt. *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983). Then we must determine whether *the same* evidence supports an inference other than that appellant's conduct which contributed to causing the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result. If it does, a trier of fact could not reasonably find "yes" on special issue number one, and the punishment must be reformed to life imprisonment. *Green v. State*, 682 S.W.2d 271, 288 (Tex.Cr.App.1984).

Viewing the evidence in the light most favorable to the verdict, we find that the evidence supports a finding of appellant's complicity in the fatal shooting. Testimony showed that early in the offense appellant possessed the pistol from which the fatal shot was fired. Only after appellant's co-defendant had trouble operating the shotgun did appellant exchange weapons with his co-defendant. The fatal shot was fired after only giving the deceased a few second's warning and without any provocation on the part of the deceased. Clearly whoever fired the shot did so deliberately and with the sole intent of killing the deceased.

As we noted above in appellant's second ground of error, even if we assume that appellant's co-defendant fired the fatal shot, the evidence is still sufficient for the jury to conclude that appellant aided his co-defendant with the intent that the deceased be killed. Appellant furnished the weapons used during the offense. After the deceased was shot, the appellant repeatedly fired his weapon into the armored van still occupied by Ms. Wright. The evidence in the instant case, unlike the evidence presented in *Enmund v. Florida*, supra, demonstrated that appellant himself

attempted to kill. We find the evidence sufficient to support an affirmative answer to the first special issue. *Selvage v. State,* supra.

■ The second special issue is found in Article 37.071(b)(2), V.A.C.C.P., and requires the jury to determine:

"whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; . . ."

At the penalty stage of the trial, the jury may consider all of the evidence adduced at the guilt stage. *Green v. State,* supra; *O'Bryan v. State,* 591 S.W.2d 464, 481 (Tex.Cr.App.1979); *Burns v. State,* 556 S.W.2d 270, 280 (Tex.Cr.App.1977); In some cases the circumstances of the offense can alone sustain an affirmative answer to the second issue. We believe this is such a case.

The evidence shows that appellant and his co-defendant carried out a well prepared robbery. Throughout the trial the witnesses to the offense repeatedly described the actions of appellant and his co-defendant as "professional." In broad daylight in the middle of a huge city, they proceeded to rob the armored car attendants and murder the driver in a cold-blooded fashion before he offered any type of resistance whatsoever. Then, in close proximity to a crowded department store and in wanton disregard for the lives of scores of bystanders, they unleashed a fusillade of shots into the still occupied armored van. As the State correctly asserts, ". . . the circumstances of the instant offense were more akin to a terrorist attack than the ordinary robbery-murder. . . ."

This evidence coupled with the additional evidence adduced at punishment when viewed in the light most favorable to the verdict clearly supports the jury's finding as to special issue number two. *Green v. State,* supra. Appellant cites us to several cases that allegedly support his argument that the evidence is insufficient to support the jury's findings as to the two special issues. *Roney v. State,* 632 S.W.2d 598 (Tex.Cr.App.1982); *Garcia v. State,* 626 S.W.2d 46 (Tex.Cr.App.1982); *Wallace v. State,* 618 S.W.2d 67 (Tex.Cr.App.1981); *Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App.1980); *Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978). We have reviewed these cases and find them to be distinguishable from the instant case on their facts. As we stated in *Cannon v. State,* 691 S.W.2d 664 (Tex.Cr.App.1985), each of these cases must be decided on its own merit. Appellant's ground of error is overruled.

■ In his eighth ground of error appellant maintains that the trial court erred in refusing to instruct the jury on the lesser included offense of murder. He argues that since the State produced no evidence that he had the intent to kill, the jury could have found that the killing was not intentional but occurred within the purview of the felony murder statute V.T.C.A., Penal Code, Section 19.02(a)(3).

In determining whether a charge on a lesser included offense is required, we use a two step analysis. First, the lesser included offense must be included within the proof necessary to establish the charged offense. Second, there must be evidence in the record that if the defendant is guilty, he is not guilty of the charged offense, but only of the lesser offense. *Rogers v. State,* 687 S.W.2d 337 (Tex.Cr.App.1985); *Royster v. State,* 622 S.W.2d 442 (Tex.Cr.App.1981).

V.T.C.A., Penal Code, Section 19.03 in part states that a person commits the offense of capital murder if that person intentionally commits the murder in the course of committing or attempting to commit the offense of robbery. The statute further provides that if a jury does not find a defendant guilty of an offense under this section, the defendant may be convicted of murder or any other lesser included offense. Sec. 19.03(c), supra. See also *Ex parte McClelland,* 588 S.W.2d 957 (Tex.Cr.App.1979). Article 37.09, V.A.C.C.P., provides in pertinent part:

"An offense is a lesser included offense if:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; ..."

The elements of felony murder are set out in V.T.C.A., Penal Code, Section 19.-02(a)(3). As applied to this case, they are:

(1) a person,

(2) committing or attempting to commit a robbery,

(3) who in the course of and in further-ance of the commission or attempt,

(4) commits or attempts to commit an act clearly dangerous to human life,

(5) that causes the death of an individu-al.

■ Whether an offense bears such a relationship to the offense charged so as to constitute a lesser included offense must be made by a case by case determination. *Hazel v. State,* 534 S.W.2d 698 (Tex.Cr. App.1976); *Ex parte McClelland,* 588 S.W.2d 957 (Tex.Cr.App.1979). In the in-stant case felony murder is a lesser includ-ed offense of the charged capital murder. The only difference in the two offenses is the culpable mental state. In capital mur-der, there must be an intent to kill, while in the felony murder, there must only be an intent to commit the underlying offense, in this case robbery.

"Capital murder prohibits the *inten-tional* taking of a life during the com-mission of a felony. The felony murder statute dispenses with any inquiry into the mens rea accompanying the homicide itself. The underlying felony provides the necessary culpable mental state. See *Garrett v. State,* 573 S.W.2d 543 (Tex.Cr. App.1978); *Rodriquez v. State,* 548 S.W.2d 26 (Tex.Cr.App.1977)." *Lamb v. State,* 680 S.W.2d 11 at 15 (Tex.Cr.App. 1984).

See also: Crump, "Capital Murder: The Issues in Texas," 14 Houston L.Rev. 531 at 536 (1977).

The crucial question which we must re-solve then in our two step analysis is whether the evidence showed in any way that the appellant only had the intent to rob and did not have the intent to kill. We must make our determination using two separate analysis: (1) by assuming the ap-pellant was the primary actor and thus did the actual shooting; or (2) by assuming that appellant's co-defendant, Meanes, did the actual shooting and appellant's guilt was imputed by the law of parties. (See our prior discussion in ground of error number three on parties.)

The evidence shows that the deceased was shot as he walked from the Purolator van towards the main entrance of the Sage store. Witnesses testified that the only warning given to the deceased was that he should halt or else he would be shot. The witnesses testified that immediately after they heard this warning, two shots were fired, one of which struck and killed the deceased. Evidence also showed that al-though the deceased was wearing a gun, his holster snap had never been unfas-tened. We find that the evidence raised only a cold-blooded, unprovoked killing. The shooter, whoever he was, gave no op-portunity whatsoever for the deceased to cooperate in any way. Clearly, he fired his gun at the deceased with only one intent— the intent to kill. Whether the deceased was the actual shooter or criminally re-sponsible for the acts of the shooter by virtue of the law of parties, we find the evidence shows not only the intent to com-mit robbery, but also the intent to kill. Thus we find that the evidence did not raise the issue of felony murder.

Appellant has cited *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), in support of his argument. We find that *Beck* is distinguishable from the instant case in that Beck testified at trial and denied that he killed the victim or intended the victim's death. Although we realize that the evidence raising the lesser included offense does not have to come from the defendant but may come from any source, *Lugo v. State,* 667 S.W.2d 144 (Tex.Cr.App.1984), we have carefully re-viewed the record and can find no evidence that appellant, acting either as the primary actor or as a party, possessed only the intent to rob. Compare *Broussard v.*

*State*, 642 S.W.2d 171 (Tex.Cr.App.1982). We hold that the trial court properly refused to charge the jury on the lesser included offense of murder.

■ In his first ground of error appellant argues that the trial court committed reversible error by not allowing him to question prospective jurors regarding lesser included offenses. During his voir dire examination defense counsel attempted to question a prospective juror regarding the lesser included offense of murder and its range of punishment. The State objected to this line of questioning and the trial court instructed defense counsel that he was not to question any prospective jurors regarding lesser included offenses.

Article 35.16(c)(2), V.A.C.C.P., provides:

"(c) A challenge for cause may be made by the defense for any of the following reasons:

.    .    .    .    .

2. That he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor."

It is well established that murder can be a lesser included offense of capital murder. Thus in a capital murder case the appellant has a right to voir dire the prospective juror members on the lesser included offense of murder and its minimum range of punishment and to challenge for cause any juror who could not give the minimum punishment for murder. *Barrow v. State*, 688 S.W.2d 860 (Tex.Cr.App.1985); *Jordan v. State*, 635 S.W.2d 522 (Tex.Cr.App.1982); *Von Byrd v. State*, 569 S.W.2d 883, 891 (Tex.Cr.App.1978). Clearly the trial court erred in restricting appellant's voir dire examination on this point.

However, under the facts of this case, reversal is not mandated. The evidence adduced at trial did not raise the issue of the existence of the lesser included offense of murder and thus it was not necessary for the jury in this case to consider the issue. This situation is analogous to the situation presented in *Vickery v. State*, 566 S.W.2d 624 (Tex.Cr.App.1978), a case involving the sexual abuse of a child. In *Vickery* the accused contended that the trial court erred in denying him an opportunity to question the jury panel on the law relating to the accomplice witness rule. This Court held that even though the child victim may have been an accomplice witness, reversal was not mandated because Article 38.07, V.A.C.C.P., provides for an exception to the accomplice witness rule set out in Article 38.14, V.A.C.C.P., when the accomplice witness is a victim of a sexual offense. The Court inferred that reversible error might have occurred had there been a witness other than the victim who was an accomplice witness.

We give the same warning in the instant case. Restriction of the voir dire examination as was made in this case would have warranted reversal had there been evidence produced during trial that raised the issue of the lesser included offense of murder. See also *Hart v. State*, 634 S.W.2d 714, 716 (Tex.Cr.App.1982). This ground of error is overruled.

■ Article 37.071(a), V.A.C.C.P., provides that "evidence may be presented as to any matter that the court deems relevant to sentence" during the punishment phase of a capital murder trial. This has been interpreted to include evidence of unadjudicated extraneous offenses. *Smith v. State*, 683 S.W.2d 393, 405 (Tex.Cr.App. 1984); *Rumbaugh v. State*, 629 S.W.2d 747 (Tex.Cr.App.1982). At the punishment stage of appellant's trial, the State offered evidence of two unadjudicated extraneous offenses allegedly committed by appellant: the theft of the car used by the appellant and his co-defendant to drive to the Sage store and an attempted escape by appellant and several other inmates from the Harris County jail while appellant was awaiting trial for this offense. The appellant timely requested the trial court to include a limiting instruction in the punishment charge to the effect that the jury could consider the

extraneous offenses only if they believed beyond a reasonable doubt that the appellant committed the offenses, and then only insofar as they related to answering the second special issue. The trial court denied this request. Appellant now complains that this omission from the court's charge constituted fundamental error. He contends that fundamental fairness, due process and equal protection of the law require at least that the jury find that the accused committed any extraneous offenses by proof beyond a reasonable doubt before they consider the extraneous offenses for any purpose. Appellant correctly argues that it is *sometimes* proper in noncapital cases for the trial court to give a charge limiting the jury's consideration of extraneous offenses. *Barber v. State*, 511 S.W.2d 937 (Tex.Cr.App.1974). However, appellant has cited no cases which stand for the proposition that such a limiting instruction is required in capital murder cases, nor have we found any such authority. To the contrary, in *Johnson v. State*, 629 S.W.2d 731, 736 (Tex.Cr.App.1981), this Court held that in the absence of an objection, the failure to submit such a limiting instruction on extraneous offenses is not fundamental error.

Recently in *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1984), this Court set out two standards for reviewing error in the jury charge.

"... If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is 'calculated to injure the rights of defendant,' which means no more than there must be *some* harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless.

"On the other hand, if no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'

"In both situations the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." 686 S.W.2d at 171.

In *Kucha v. State*, 686 S.W.2d 154 (Tex.Cr. App.1985), we applied *Almanza* to alleged error in the court's charge on punishment.

We note initially that the question as to whether appellant committed the two extraneous offenses was contested at trial by the defense. The trial court instructed the jury in at least two separate places in its charge on punishment that the special issues must be proven beyond a reasonable doubt before they could be answered affirmatively:

"In connection with your consideration of the evidence presented with respect to the question of punishment, I am submitting to you certain issues to be determined by you in accordance with instructions which I shall give you. *The State must prove each issue submitted beyond a reasonable doubt,* and you shall return a special verdict of 'yes' or 'no' on each issue submitted.

.   .   .   .   .

ISSUE NO. 2

"Do you believe from the evidence *beyond a reasonable doubt* that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?"

A review of the jury argument on punishment shows that both the State and the defense stressed to the jury that the State had to carry their burden *beyond a reasonable doubt.*

We agree with the State that no error is present in the instant case. The wording of the court's charge properly informed the jury that they must believe *from the evidence beyond a reasonable doubt that there was a probability that the appellant*

would commit future criminal acts of violence before they could answer the second special issue affirmatively. The charge submitted to the jury, coupled with the closing argument of both sides on punishment, adequately instructed the jury as to the law. This ground of error is overruled.

■ In his fifth ground of error, appellant argues that the trial court committed reversible error by refusing to allow appellant to call the prosecutor, Mike Wilkinson, as a witness before the jury to prove appellant had not been indicted in connection with the extraneous offense of attempted escape, evidence of which had been introduced during the punishment phase of the trial. At a hearing outside the jury's presence during the punishment phase of the trial, appellant's attorney elicited the following testimony from prosecutor Wilkinson:

"Q. And as Assistant District Attorney, do you know who has been indicted for the attempted escape of June 14, 1981, from Tank 36 of the Harris County Jail?

"A. Of my own knowledge, no.

"Q. No one?

"A. I don't know who was or who was not indicted.

"Q. Was Carlos Santana?

"A. Not to my knowledge.

"Q. Certainly, as a prosecutor assigned to—

"A. I can almost say yes, *I can say definitely he has not been indicted because I don't have any case on him.*

"Q. It would have come here to this Court under the lower numbered theory which would have attracted it, would it not?

"A. Yes, sir. I have not sought an indictment against him on the escape out of 36 on June 14."

The trial court refused to allow the appellant to introduce this evidence before the jury. Appellant now argues that he should have been allowed to present this testimony to the jury. He maintains that the underlined portion of the above testimony shows that the State did not have enough evidence to show probable cause to a grand jury and thus the record demonstrates that the State was exercising bad faith in presenting any evidence of the attempted escape to the jury.

We must note initially that we do not interpret the underlined portion of the prosecutor's testimony to indicate that the State lacked enough evidence to show probable cause to indict appellant for the attempted escape. Reading the testimony as a whole, it is clear that the prosecutor was testifying that the only way he could tell that appellant had not been indicted for the attempted escape was because such a case had not been assigned to him or his court.

Even if the remark could be construed as appellant contends, we feel no error is present in the instant case because the fact that appellant had not been indicted for the offense came before the jury through the testimony of defense witness Clinton Ray Derry. Derry, another inmate of the Harris County Jail at the time of the attempted escape, testified that appellant did not participate in the attempted escape. On cross-examination by the State the following occurred:

"Q. You weren't involved in the escape, were you sir?

"A. No.

"Q. You weren't charged with it. There was only one person that was eventually charged with the escape; isn't that correct?

"A. Correct.

"Q. Who was that, to your knowledge?

"A. Joseph Nichols."

This ground of error is overruled.

■ In his sixth ground of error, appellant claims he was denied his right to assistance of counsel, his right to confront and cross-examine witnesses against him, and his right to compel the attendance of witnesses as a result of the trial court's action in allowing the witness James Paul Martin to claim his Fifth Amendment privilege at a time when he had effectively waived that privilege. During the punish-

ment phase of the trial the State called James Paul Martin who testified regarding the attempted escape from the Harris County Jail. On direct Martin testified that he was under indictment for seven counts of aggravated robbery and robbery in Harris County and had federal charges pending against him for felony escape and felony theft of government property. He testified that he was serving a sentence for bank robbery in the federal penitentiary at Bastrop when the felony escape and felony theft occurred. He further testified that he had previously been incarcerated twice in the Texas Department of Corrections— the first time for one felony theft and the second time for two additional felony thefts and a burglary. He also testified that he was known as "The Gentleman Bandit." On cross-examination, Martin testified that he reported the escape because he did not believe in killing or taking hostages. When the defense attorney began asking Martin if he had ever threatened anyone or used a weapon during the robberies he had committed, Martin replied that he had not yet been convicted of those crimes. At that point the trial court removed the jury from the courtroom and the State objected to defense counsel's improper form of impeachment. Defense counsel argued that the witness' direct testimony had opened the door for this type of impeachment and asked the court to allow him to ask the witness if he had ever exhibited, used or displayed a deadly weapon in the commission of a robbery. After hearing argument from both sides, the trial judge ruled that if he desired the witness could take the Fifth Amendment on any questions regarding any non-adjudicated offenses. The court further ruled that defense counsel could ask the witness if the indictments pending against him alleged that he used a firearm during the commission of the offenses, but defense counsel could not go into the facts of any non-adjudicated offenses. After the jury was returned defense counsel asked Martin if he was named the "Gentleman Robber" because he was nonviolent. When Martin replied affirmatively, defense counsel had the wit-

ness read into evidence Defense Exhibits 12 and 13, two indictments charging him with four separate counts of aggravated robbery, three of which alleged the use of a deadly weapon.

Appellant now maintains that Martin's direct testimony which gave the jury the false impression that he was a nonviolent person waived his Fifth Amendment privilege and opened the door to questioning as to his use of deadly weapons in connection with the offenses he had committed. His argument on appeal is premised on the assumption that Martin claimed his Fifth Amendment privilege and refused to answer defense counsel's questions regarding the use of weapons. However, a close reading of the record shows that Martin never did claim the privilege. The record shows that when defense counsel asked Martin out of the jury's presence if he had "ever exhibited, displayed, used a deadly weapon, such as a pistol, in the commission of any offense", the State immediately objected, the trial court sustained the objection and the witness was not allowed to voice any answer. Thus the Fifth Amendment plays no part in the merits of this ground of error. The only question before us is whether appellant's question was a proper form of impeachment.

Article 38.29, V.A.C.C.P., governs the impeachment of witnesses by prior offenses. Ordinarily, a witness may not be impeached by a pending charge. The exception to this rule is that a court may permit impeachment by pending charges to show the bias, prejudice or interest of the witness in testifying. *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985); *Evans v. State*, 519 S.W.2d 868 (Tex.Cr.App.1975).

In *Murphy v. State*, 587 S.W.2d 718, 722 (Tex.Cr.App.1979), this Court held that an issue regarding the general credibility of a witness in a criminal trial is not a material issue in the sense that it will justify the admission of inherently prejudicial evidence of details of an extraneous offense committed by the witness.

"In limited circumstances, proof of the fact that charges have been filed against

a witness may become admissible upon a showing that such evidence tends to establish prejudice, interest, bias or motive of the witness in testifying as he has." 587 S.W.2d at 722.

A review of the record shows that the jury was fully informed as to the pending charges. Appellant's counsel repeatedly asked Martin about the existence of any benefit which he might earn regarding the charges as a result of his testimony against appellant. Martin repeatedly denied the existence of any such agreement. As to his use of a weapon during the commission of these extraneous offenses, the jury was clearly informed that the State's allegations included the use of a deadly weapon. Thus it was up to the individual members of the jury to use this information in judging the credibility of Martin. We find no error.

██ In his seventh ground of error appellant argues that the trial court erred in admitting oral statements made by appellant at the time of his arrest. During the guilt phase of the trial a hearing was conducted as to the admissibility of the statements. The evidence adduced at the hearing showed that appellant and his co-defendant, James Ronald Meanes, were arrested shortly after the robbery was committed as they exited from a canefield. The two men were handcuffed and put in separate cars. Before they were taken to the Houston police department both men were read their rights and questioned briefly by Detective Hipolito Galano. Meanes was given his *Miranda* warnings and questioned first, at which time he revealed the location of the weapons in the canefield. Appellant was then given his warnings and questioned. He also revealed the location of the weapons. Appellant did not add any additional information to the statement already obtained from Meanes.

At the conclusion of the hearing the trial court found that both Meanes and appellant made oral statements immediately following their arrests concerning the location of the weapons; that the weapons had not been located prior to this time; that no coercion was used by the police in getting the statements; that both defendants had been properly warned; and thus the statements of appellant were admissible.

Article 38.22, Section 3(c), V.A.C.C.P., provides that a properly warned oral statement resulting from custodial interrogation is admissible if it:

"... contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed."

Appellant now maintains that in light of the testimony that the police already knew where the weapons were as a result of information they had gleaned from Meanes, and since the officer who eventually found the weapon testified that he would have searched the area anyway, the appellant's statements did not lead to the recovery of anything not already known to be true and were therefore inadmissible.

The fallacy with appellant's argument is that at the time appellant gave his oral statement, the police had not ascertained that Meanes' statement as to the location of the weapons was true. The situation in the instant case is not like the situation presented in *Gifford v. State*, 630 S.W.2d 387 (Tex.App.—Austin 1982, no petition), cited by appellant. In *Gifford*, the defendant's statements as to a pair of cuff links taken in a burglary were held to be inadmissible because at the time the statement was made the police knew the cuff links had been taken *and in fact had already located them* as a result of information given by Gifford's co-defendant. In the instant case appellant's statement was given almost simultaneously to that of his co-defendant. The information contained within the statements was new to the police and led directly to the recovery of the weapons used during the commission of the offense. This situation falls directly into the category of admissible statements outlined in Article 38.22, Section 3(c), supra. We find no error.

Appellant has filed two supplemental briefs. Although he is not entitled to hybrid representation, we have reviewed the grounds of error raised therein and we find them to be without merit.

The judgment is affirmed.

CLINTON, J., dissents.

TEAGUE, J., dissents on Grounds One and Two.

MILLER, Judge, concurring.

In his first ground of error (at 10), appellant complains that the trial court erred by not allowing him to question prospective jurors regarding the lesser included offense of murder. Initially, our recent decision in *Pierce v. State*, 696 S.W.2d 899 (Tex. Cr.App.1985), also a capital murder case, seems right on point. In *Pierce*, supra, we ordered a reversal seemingly under the same facts as present in the instant case. What was not stated in the opinion in *Pierce*, supra, was that the trial court's charge therein contained instructions on the lesser included offense of murder. Thus we are not in conflict with prior caselaw when we hold that henceforth, prior to deciding whether to reverse, we will look to the harm in denial of a "proper" voir dire question by examining the record of the evidence and the court's charge.

One cautionary note: This distinction between error and reversible error should not be a factor in the decision that a trial judge makes vis-a-vis what questions he will, in his discretion, allow during voir dire. True, a judge who intentionally commits error will not have to try the case again if the error is not reversible, e.g. "harmless". This truism, however, neither alters the reality that error is error nor justifies intentionally committing error. A proper[1] voir dire question should be allowed regardless of an opposing litigant's belief that the issue will not arise during trial

(and therefore not render denial of the question reversible error).

Emphasizing that denial of proper questions, such as in the case at bar, is error, I join the majority.

---

1. For this Court's latest discussion of what constitutes a proper voir dire question see *Smith v.* ▮▮▮▮ *State*, 703 S.W.2d 641 (Tex.Cr.App.1985).