

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-75,359

**STEPHEN DALE BARBEE, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL
FROM CAUSE NO. 1004856R IN THE 213TH DISTRICT COURT
TARRANT COUNTY**

**HOLCOMB, J., delivered the opinion of the unanimous Court.**

In February 2006, appellant was convicted of capital murder. TEX. PEN. CODE §
19.03(a). Based on the jury's answers to the special issues set forth in Texas Code of
Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant
to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h).

---

[1] Unless otherwise indicated, all references to Articles and Sections refer to the Texas
Code of Criminal Procedure and the Texas Penal Code, respectively.

After reviewing appellant's nine points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment.

STATEMENT OF FACTS

Appellant was charged with murdering Lisa Underwood and her seven-year-old son, Jayden Underwood, during the same criminal transaction. TEX. PEN. CODE § 19.03(a)(7)(A). Lisa owned a bagel shop in Fort Worth with her friend Holly Pils. Pils testified that appellant, who was married, had been a customer at the bagel shop and that he and Lisa began a personal relationship in Fall 2003. They stopped seeing each other at the end of 2003, and Lisa began dating another man at the beginning of 2004. She was still dating the other man when she resumed her relationship with appellant in July 2004, and she became pregnant around that time. She informed both men that she was pregnant but told appellant that she believed he was the father of the unborn child. She told Pils that she wanted her baby to have health insurance and that she had discussed the matter with appellant.

Pils testified that Lisa, who was more than seven months pregnant, stayed home from work on Friday, February 18, 2005, because she had a cold. Pils planned to host a baby shower for Lisa at the bagel shop the next day. Lisa told Pils that she was feeling better, that she was excited about the baby shower, and that she planned to arrive at the bagel shop shortly before 4:00 p.m. on Saturday, February 19th.

At approximately 3:00 on Saturday morning, Denton County Deputy Sheriff David

Brawner saw a man walking along the service road of Interstate Highway 35. Brawner stopped his patrol car behind the man and activated his overhead emergency lights and his "in-car video camera system." It was cold outside, and it had been raining. Brawner testified that the man's clothes were "very wet" and that he was "covered in mud." When Brawner asked the man for identification, he said that he had left his wallet at his friend's residence nearby. He gave the officer a false name and date of birth and "took off running on foot" when Brawner spoke with dispatch in an effort to verify the information. Brawner ran after the man, but he disappeared into a thickly wooded area. Brawner and other officers searched the area for hours but were unable to locate the man. Brawner later identified the man as appellant in a photo spread.[2]

The police were contacted after Lisa failed to show up for her baby shower later that day. There were no signs of forced entry at Lisa's house. Jayden's shoes were on top of the fireplace hearth, and his glasses had been left next to his bed. There was blood in the living room on the entertainment center, the walls, and a fitted couch cover. It appeared that someone had attempted to clean and conceal a saturation blood stain on the living room floor. Lisa's car was gone, and there was blood on the floor in the garage. Lisa's DNA profile was consistent with the blood stains in the house and the garage. Her personal home computer

---

[2] Brawner testified that he was "100 percent positive" or "110 percent positive" when he identified appellant in the photo spread. However, Detective Michel Carroll of the Fort Worth Police Department had a different opinion regarding Brawner's level of certainty. Carroll testified that Brawner's identification of appellant "wasn't good enough" for an arrest and conviction, but it was good enough to cause Carroll to be more suspicious of appellant.

showed that she logged on to the internet at 11:22 p.m. on February 18 and logged off at 12:02 a.m. on February 19.  The last website she visited was "birthplan.com."

On February 21, Lisa's Dodge Durango was found in a creek approximately 300 yards from where Officer Brawner had encountered appellant two days earlier.  The front end of the vehicle was submerged in the creek.  The windows were down and the hatchback was up.  There was a bottle of cleaning solution in the cargo area of the vehicle.  Lisa's car keys and purse were located nearby.

On the same day that Lisa's car was found, Detectives Michel Carroll, John McCaskell, and Brian Jamison of the Fort Worth Police Department traveled to Tyler to speak with appellant, his wife Trish Barbee, and his co-worker Ron Dodd.  The detectives initially talked to them in the parking lot of a Wal-Mart, but later asked them to come to the Tyler Police Department for further questioning.  At the police department, Carroll and Jamison interviewed appellant in one room, and McCaskell interviewed Dodd in another room.  Appellant received his *Miranda* warnings and his interview began at about 7:45 p.m.[3] In this interview, which was recorded on a digital video disc (DVD), appellant said that he worked cutting down trees in Tyler during the day on February 19.  He said that he drove to his home in Fort Worth that evening and that he went over to Dodd's house later that night to work on the truck that they used as their business vehicle.  He left Dodd's house at around 2:00 or 3:00 a.m.  It took over an hour for him to drive home because the truck was

---

[3] *Miranda v. Arizona,* 384 U.S. 436 (1966).

"sputtering" and "leaking oil." His wife was asleep when he arrived home, and he slept on the couch so he would not wake her. He acknowledged that he had dated Lisa and that she had informed him he might be the father of her unborn child, but he claimed that he had not seen or heard from her in a while. He eventually acknowledged that he had been stopped by a police officer in Denton County at around 3:00 a.m., that he had given the officer a false name and date of birth, and that he had run away from the officer.

Carroll testified that he excused himself to observe McCaskell's interview with Dodd, then he returned to appellant's interview room and asked, "Does FM 407 sound familiar to you?" He placed photographs of Lisa and Jayden on the table and walked out of the room, leaving appellant alone. Appellant later opened the door and asked to use the men's room. Carroll accompanied him to the bathroom where they had an un-recorded conversation for about forty-five minutes to one hour. Carroll testified that he told appellant that Dodd was "going to lay this whole thing in [appellant's] lap" and that "Lisa's family needed closure." Appellant made comments "about being locked up [for] the rest of his life" and said that he understood the need for closure because he had lost a family member. Appellant told Carroll that "he and Dodd actually created a plan to go kill Lisa" because "Lisa wanted to use his name on a birth certificate or she was trying to take money from him, she was going to ruin his family, his relationship with his wife, Trish, and he did not want that to happen." Appellant said that he dropped his car off at Dodd's house and then Dodd drove him to Lisa's house. Dodd left, and appellant went inside and tried to "pick a fight" with her. He

was unable to provoke a fight, so he called Dodd to pick him up. He later had Dodd take him back to Lisa's house. This time, "he was able to get her upset enough that he could start a fight with her." He wrestled her to the ground and "held her face into the carpet until she stopped breathing." Jayden came into the room and was "crying" and "emotional." Appellant said he walked up to Jayden, placed his hand over his mouth and nose, and "held it there until he stopped breathing." Afterwards, appellant "tried to clean up the house" and "tried to cover a blood spot with a piece of furniture." He placed the bodies of Lisa and Jayden into Lisa's car and drove to "a road off of FM 407 where they buried both their bodies." He said that he used a shovel Dodd had given to him and that he buried the bodies in a shallow grave and placed debris on top of it. He then drove Lisa's car to another location and "stopped it just short of the creek." After relating this story, appellant agreed to have another digitally recorded video interview with Carroll.

Carroll testified that he and appellant left the bathroom and went to Detective Richard Cashell's desk where appellant assisted them in mapping out the location where he had buried the victims. They used "MapQuest" to "get a map of that area" and appellant showed them "the roads that he traveled" and where he "put the victims' bodies." Carroll and appellant then went back to the interview room where appellant gave his second digitally recorded video statement shortly after 11:00 p.m.

After Carroll interviewed appellant, he left the interview room and spoke with appellant's wife, Trish Barbee. Carroll told Trish that appellant had confessed to killing Lisa

and that he wanted to talk to her. Trish wanted to speak with appellant, so Carroll brought her to the interview room. Carroll remained outside, and the digital video recorder continued running as appellant and Trish conversed. Trish asked appellant what happened. Appellant explained that Lisa called him and threatened him, so he went to her house and tried to talk to her. He said that Lisa said she would "ruin" him and that she fought with him and kicked him. He explained that he "held her down too long" and that he "didn't mean for her to stop breathing."

Carroll testified that appellant spent that night in the Smith County Jail. The next morning, he rode with Carroll and Officer Mark Thornhill and directed them to the location of the bodies. Carroll testified that appellant stated, "[W]hen I take you to the bodies, I don't want to see the bodies, and I don't want the media to see me." When they got closer to the location, appellant told the officers to take a different exit and "took [them] a back route to the same location." When they arrived, appellant sat in the car and directed them to the grave by yelling out the window. Carroll testified that Dodd had already taken police to "the same area," but that the bodies were not located until appellant arrived. The bodies were located in a shallow grave that had tree limbs placed on top of it.

The medical examiner who performed Lisa's autopsy testified that Lisa suffered facial abrasions and contusions and a broken arm. She had bruises on both sides of her back that could have been caused by being hit or by having "external force applied over a longer period of time." Her injuries were consistent with a person holding her down and stopping her from

breathing. The cause of her death was "traumatic asphyxiation," and the manner of her death was homicide. Lisa was pregnant with a healthy female fetus that appeared to be around seven months gestational age. The cause of the fetus' death was "fetal asphyxiation" resulting from "maternal asphyxiation."

The medical examiner who performed Jayden's autopsy testified that Jayden had a large bruise above his right temple that was "due to some sort of impact to the head." He had bruises on his back and abrasions on his back, arm, hip, and leg. He had bruises on his lips and gums that appeared to be "caused by some sort of compression, some object put over the area of the mouth and pressing on the mouth and compressing the lips against the underlying teeth." The medical examiner testified that Jayden's injuries were consistent with: someone placing a hand over Jayden's mouth and nose; someone pressing Jayden's face against a flat surface; or, someone pressing Jayden's face against a surface that "gives if you push against it," like a couch or a carpeted floor. He determined that the cause of Jayden's death was "asphyxia by smothering" and the manner of his death was homicide.

At punishment, the State presented the testimony of appellant's ex-wife, Theresa Sue Barbee. Theresa testified that she was married to appellant from 1996 to 2003 and that he physically assaulted her during the course of their relationship. During one of their fights, she suffered a "bad concussion." Appellant sat in another room eating ice cream while she was bleeding and unconscious, and he made her drive herself to the hospital when she awoke. Theresa also testified that appellant told her and others that he was going to put her

"through a [wood] chipper."

Theresa further testified that she was dating Dodd at the time of the instant offense. She testified that appellant and Dodd had been at her house on the night of Friday, February 18, 2005. Dodd and appellant left in Dodd's truck sometime after 10:00 p.m., and Dodd returned alone shortly thereafter. As soon as Dodd returned, appellant called him. Dodd left again and returned with appellant about fifteen minutes later. At around 3:00 a.m., appellant called Dodd and Theresa heard appellant say "come and help him" and that "[h]e ran out of gas." Dodd left and Theresa went to sleep. When she next saw appellant on Sunday morning, he cried and said that "his life was over with." Theresa mentioned the missing woman and asked, "What have you done?" Appellant said, "Help me," and that he "was guilty until proven innocent." Appellant later called Theresa and said that he had confessed to police. He was crying and said that "he didn't mean to" and that he "went over there to talk to her . . . and do the right thing . . . [and] they got into a fight . . . she hit him, and they just got into it." Theresa asked, "What about the boy?" Appellant replied that "he didn't mean to" and "he was just trying to keep him quiet." Theresa asked him if Dodd was involved, and he said "Ron's mistake was picking him up." Appellant later kept changing his story and saying that he did not do it. When Theresa later visited appellant in jail, he held up a piece of paper asking her to say that Dodd did it and set him up. She started crying and left. Appellant had her removed from his visitors list following that encounter.

The State also presented the punishment testimony of Marie Mendoza, who briefly worked with appellant at the United Parcel Service in 2000 or 2001. Mendoza testified that appellant called her often and claimed that he was not married. When he told her that he had a tree-trimming business, Mendoza asked him to come to her house and give her an estimate. She came home one day and found that he already trimmed her trees without giving her an estimate first. She spoke to him on the telephone a few days later, telling him that she was not interested in a relationship and offering to pay him for his work. Appellant responded with a "big outburst" and yelled and cursed at Mendoza. He called her a "fucking bitch" and said, "I go out there and trim your trees and this is what I get in return?" Following that incident, Marie had no further contact with appellant and never saw him at work again.

## SUFFICIENCY OF THE EVIDENCE

In point of error one, appellant argues that the evidence is legally insufficient because the State failed to prove that the grand jury exercised due diligence in determining the manner and means used to cause Jayden's death. The indictment alleged, in pertinent part:

> . . . and during the same criminal transaction, the defendant intentionally or knowingly caused the death of another individual, Jayden Underwood, by smothering him with his hand or by a means unknown to the grand jury or by a combination of the two[.]

Appellant asserts that the evidence at trial "conclusively established the manner and means used to facilitate Jayden Underwood's death," relying specifically on the following testimony by Detective Carroll:

[PROSECUTOR]: Did [appellant] say anything about Jayden?

[CARROLL]: He did. He said that while he was in the process of killing Lisa, Jayden came to the front room, the room where he was fighting with Lisa, and Jayden was crying, [was] emotional. He looked up and saw Jayden standing there and he paused.

So I asked him, "How did you kill Jayden?" He said, "I walked up to him and I placed my hand over his mouth and nose and held it there until he stopped breathing."

Citing *Hicks v. State,* 860 S.W.2d 419 (Tex. Crim. App. 1993), appellant argues that because Detective Carroll's testimony conclusively established the manner and means used to cause Jayden's death, the State was required to prove that the grand jury used due diligence in attempting to ascertain the manner and means.[4] The State called the grand-jury secretary to testify at trial, but appellant asserts that his testimony was insufficient to show that the grand jury exercised due diligence in attempting to ascertain the manner and means used to cause Jayden's death.

As we stated in *Rosales v. State,* 4 S.W.3d 228, 231 (Tex. Crim. App. 1999), "the rule in cases like *Hicks* is no longer viable in light of our decision in *Malik*." *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)(holding that sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case). Further, like the jury in *Rosales,* the jury in appellant's case was charged in the disjunctive. 4 S.W.3d at 231. The evidence presented at appellant's trial

---

[4] The State disagrees that Carroll's testimony conclusively established the manner and means of Jayden's death, pointing out that the medical examiner testified that Jayden's injuries were consistent with three possible scenarios: someone placing a hand over Jayden's mouth and nose; someone pressing Jayden's face against a flat surface; or, someone pressing Jayden's face against a surface that "gives if you push against it," like a couch or a carpeted floor.

supported the theory that appellant caused Jayden's death by smothering him with his hand. *See id., citing Kitchens v. State,* 823 S.W.2d 256, 258-59 (Tex. Crim. App. 1991)(holding that when a jury returns a general guilty verdict on an indictment charging alternative theories of committing the same offense, the verdict stands if evidence supports any of the theories alleged). The evidence, viewed in the light most favorable to the verdict, was sufficient to enable any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979). Point of error one is overruled.

In point of error two, appellant claims that the evidence is factually insufficient to support his capital murder conviction. Evidence that is legally sufficient may be factually insufficient if it is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence. *Watson v. State,* 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). A factual-sufficiency review requires the reviewing court to consider all of the evidence. *Marshall v. State,* 210 S.W.3d 618, 625 (Tex. Crim. App. 2006), *cert. denied,* 128 S. Ct. 87 (2007). A clearly wrong and unjust verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Sells v. State,* 121 S.W.3d 748, 754 (Tex. Crim. App. 2003).

Appellant claims that the evidence is factually insufficient because the State's case was circumstantial and did not include eyewitnesses or forensic evidence connecting

appellant to the crime. However, we have held that circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Appellant admitted to police that he killed Lisa and Jayden, that he attempted to clean up the crime scene, and that he disposed of their bodies and Lisa's car afterwards. The physical evidence corroborated his confession. When appellant was stopped by a police officer at 3:00 a.m. in close proximity to the area where Lisa's car was later found, his clothes were covered in mud and he gave the officer a false name and birth date before running away from him. Lisa's friend Holly Pils confirmed that Lisa had been in a relationship with appellant and that she believed that he was the father of her unborn child. Appellant told police that he did not want his wife to find out about Lisa's pregnancy, and he confirmed this during a recorded conversation with his wife. He accurately described the location where the bodies were buried, and he led police to the burial site. This evidence was not so weak that the jury's verdict seems clearly wrong and manifestly unjust. *Watson,* 204 S.W.3d at 414-15. Even considering conflicting evidence, the jury's verdict was not against the great weight and preponderance of the evidence. *Id.* Point of error two is overruled.

In point of error eight, appellant contends that the evidence was legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue. We view the evidence in the light most favorable to the jury's finding and determine whether any

rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia,* 443 U.S. 307 (1979).

Appellant committed the murders of a pregnant woman and her seven-year-old son. *See Hayes v. State,* 85 S.W.3d 809, 814 (Tex. Crim. App. 2002)(stating that the circumstances of the offense alone may be sufficient to support an affirmative answer to the future dangerousness special issue). He admitted planning Lisa's murder in order to avoid being named as the father of the unborn child. He attempted to conceal his crime and successfully evaded a police officer shortly after disposing of the bodies. The State presented further evidence at punishment that appellant verbally attacked a former co-worker and physically assaulted his ex-wife and threatened to put her "through a [wood] chipper." Both the facts of the instant offense and the other evidence showing appellant's escalating pattern of violence are legally sufficient to support a finding of future dangerousness. Point of error eight is overruled.

## VOIR DIRE

In point of error three, appellant contends that the trial court erroneously denied his challenge for cause to veniremember Denise Anderson. Appellant asserts that the trial court should have granted his challenge for cause to Anderson because she had formed an opinion about appellant's guilt based on media reports prior to trial. A veniremember is challengeable for cause if she has formed in her mind "such a conclusion as to the guilt or

innocence of the defendant as would influence [her] in finding a verdict." *See* Art. 35.16(a)(10).

We review a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate a veniremember's demeanor and responses. *Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). We will reverse a trial court's ruling on a challenge for cause only if a clear abuse of discretion is evident. *Id.* When a veniremember's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Id.* A veniremember is not challengeable for cause merely because she has heard news reports about the crime or the suspect. *Ladd v. State,* 3 S.W.3d 547, 561 (Tex. Crim. App. 1999), *citing Macias v. State,* 733 S.W.2d 192, 193 (Tex. Crim. App. 1987).

When initially questioned by the prosecutor, Anderson stated that she had seen news reports about the case on the television "at least a year" ago. The prosecutor questioned her further about this issue:

> Q.   So what I want to know is have you already decided or do you have an opinion that [appellant] is guilty right now?
>
> A.   Truthfully, the way things have been played out it seems like that's a great possibility.
>
> Q.   Uh-huh.
>
> A.   But I don't necessarily feel like I would -- I don't feel like I know everything.
>
> Q.   Okay. Do you feel like you actually know anything?

A. No, I don't feel like I know anything.

Q. You have heard police -- you have heard -- tell me what you have heard.

A. I just remember about a girl that was pregnant had gone missing. And then it seemed like they found her three days later and her boyfriend and his friend were involved and -- or the friend was involved in discovering where she was thrown. That's all I remember.

Q. Do you remember anything about the victim?

A. I remember that she was excited about going to her baby shower. Because during the time that she was missing they kind of questioned if she was depressed and if she would have left, seemed like the report did. And her friend or coworker or something said no, in fact, she was excited about having this baby and going to a baby shower.

Q. So that's what sticks in your mind?

A. That's what sticks in my mind.

Q. Do you remember anything -- you said the friend or the boyfriend. Do you remember anything specifically about the friend or the boyfriend?

A. No. I remember that it seemed like the friend didn't have any idea what was going on or something. But that he had been asked to borrow his truck or something the actual night or day she was missing or time. And the only other thing that stands out it seems like I remember hearing something about a T-shirt.

Q. Do you remember what you heard about a T-shirt?

A. I can't remember -- I can't remember if they found a T-shirt -- or I don't remember. I just remember a T-shirt.

*        *        *

Q. But obviously if you come into this -- if you already have an opinion as to this man's guilt, we need to know about it now.

A.    I don't have an opinion because, again, I don't feel like I know all the facts.  I was very sympathetic towards the girl being pregnant and excited about a baby, and I think that's why it stood out to me.

Q.    And all those feelings were based on news reports?

A.    Yes.

Q.    Okay.  Have you ever known news reports to be wrong?

A.    Of course.

                    *              *              *

Q.    Could you set aside anything you might have heard in the news media and just come in here and base your opinion in this case strictly on what's presented in the courtroom?

A.    Yes, I could.

                    *              *              *

Q.    Can you just base -- wait until you get in here before you actually know something?

A.    Yes.

Q.    Okay.  We don't ask you to -- to, you know, blank your mind.

A.    Uh-huh.

Q.    But we do ask you to not consider anything else you might have heard.  We live in a media age.  People hear things.

A.    Right.

Q.    Unless they live under a rock.

A.    Right.

Q.     But, you know, that can have an effect on a trial and we don't want that to happen.

A.     Right.

Q.     Can you -- do you think you could block that out and just -- and just get your evidence and . . . any opinions you form, form them based on the evidence in the courtroom?

A.     Yes, I could.

On voir dire examination by defense counsel, Anderson stated that she had watched television news coverage "probably about two or three times during the course of [the victim] being missing." She heard on the news reports that the missing woman was not married, that she had been excited about attending her baby shower, that her boyfriend had borrowed a truck from a friend about the time that she went missing, and that the friend seemed to have no idea what was going on "but somehow he knew where she was dumped." At that time, based on the news reports, Anderson felt that the boyfriend was involved because "most crimes are done by people that know you." Defense counsel continued to question her as follows:

Q.     Well, how are [you] going to be able -- and I don't know if you can -- to distinguish a fact that you hear at this trial versus one of these facts that you heard on the news if they're very similar to each other but maybe not exactly the same? You understand what I am saying?

A.     Yes, I do. I think probably -- I mean, you know, if you think I am the right juror for them, but I think I would be able to do it because I don't trust all the news reports and the way they -- you know, their take on things. And I wasn't -- I wasn't real interested after she was found.

Q.     Well, but you were interested enough to watch it enough to form an

opinion that [appellant] is involved?

A.    Yes.

Q.    Okay.

A.    Well, because that was the end of it, you know.  That was the end of when she was found.

*                *                *

Q.    I know you want to be able to feel what you saw then and the opinions you reached then are not going to figure in to the opinions that you reach based on what you hear in the courtroom.

A.    Right.

Q.    Okay.  But, quite frankly, you have heard a lot of things and came to a pretty strong conclusion.

A.    Right.

*                *                *

Q.    And so the question then becomes . . . what guarantee do I have that you are really not going to be considering that?  It's one thing for you to say, well, I am going to do it.  I don't question your will.  What I question is your subconscience --

*                *                *

A.    I see.  And that's -- I mean, I don't really know how to tell you that I think I could do it other than I am a person who follows rules and tries really hard . . . But I can't tell you that I'm going to be able to put it through my mind other than the fact that I don't feel like at the time I knew all the facts.  I just remember feeling very strongly concerned for this girl because she was pregnant.  And I don't know if that's because, you know, I am a mom or whatever.  And then once she was found . . . I was just glad that there was an end to it.

Defense counsel later asked Anderson if she could answer the mitigation question "in such a way as to give a life sentence, given the fact that you have already had some opinions about this?" Anderson replied, "I think that I could say yes to a life sentence, because, again, I don't feel that I really know all the details and facts of the case."

Defense counsel challenged Anderson for cause and the trial court ruled as follows:

The Court, when she began to go into all this, I took - - I observed her completely and totally the whole time. I have listened to what she had to say. I vacillated as she vacillated. And I feel like frankly that based upon what I have observed that I am going to overrule the challenge and she will be juror number 42. And it's based strictly on what I saw today and what I observed her to do.

We defer to the trial court's ruling. Anderson acknowledged that she had learned some things about the case and had developed an opinion about the boyfriend's guilt when she watched television news coverage for a few days about a year prior to trial. However, she maintained that she did not know all of the facts and that she had known news reports to be wrong. She stated that she could set her knowledge and opinions aside and base her verdict solely on the evidence presented at trial and that she could even vote for a life sentence if the punishment evidence warranted it. The totality of her voir dire testimony indicates that any conclusion she had formed about appellant's guilt would not influence her verdict. The trial court did not clearly abuse its discretion in denying the challenge for cause. Point of error three is overruled.

## ADMISSIBILITY OF ORAL STATEMENTS

In points of error four, five, and six, appellant asserts that the trial court abused its discretion in denying his motion to suppress "three separate inculpatory statements": (1) appellant's oral statement to Detective Carroll in the bathroom of the Tyler Police Department, in which he admitted killing Lisa and Jayden; (2) appellant's oral statement to Detective Carroll at Detective Cashell's desk, in which he described where the victims' bodies were buried and helped to produce a map of that location; and (3) appellant's oral statement to Detective Carroll on the way to the burial site the next morning, in which he pointed out the specific location of the bodies and expressed concerns about viewing the bodies and being seen by the media. Appellant specifically asserts that these statements were inadmissible under Article 38.22, Section 3(a), which provides:

> No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
>> (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
>>
>> (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
>>
>> (3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;
>>
>> (4) all voices on the recording are identified; and
>>
>> (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete,

and accurate copy of all recordings of the defendant made under this article.

Oral confessions are generally inadmissible unless there is compliance with all portions of Section 3(a). Art. 38.22, § 3(e); *Woods v. State,* 152 S.W.3d 105, 116 (Tex. Crim. App. 2004); *Moore v. State,* 999 S.W.2d 385, 400 (Tex. Crim. App. 1999). However, an exception set out in Section 3(c) provides:

> Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

Art. 38.22, § 3(c). Under this exception, oral statements asserting facts or circumstances establishing the guilt of the accused are admissible if, at the time they were made, they contained assertions that were unknown by law enforcement but were later corroborated. *Woods,* 152 S.W.3d at 117; *Moore,* 999 S.W.2d at 400-01. Such oral statements need only circumstantially demonstrate the defendant's guilt. *Id.* Furthermore, if such an oral statement contains even a single assertion later found to be true and conducive to establishing the defendant's guilt, then the statement is admissible in its entirety. *Id.*

The trial court held a hearing on appellant's motion to suppress his statements. The evidence at the suppression hearing showed that appellant and Dodd were questioned separately at the Tyler Police Department. Detective McCaskell interviewed Dodd, and Detective Carroll observed a portion of that interview. McCaskell testified that Dodd "had an idea of where [appellant] had last been seen with the remains of Lisa and Jayden." Carroll

testified that Dodd told McCaskell that he had seen appellant with the bodies before he buried them and that the bodies had been buried near "FM 407" in Fort Worth. McCaskell testified that Dodd agreed to show him the location where he thought the bodies might be buried. They left the Tyler Police Department about 9:50 p.m. and they arrived at that location about 1:00 a.m. Prior to their arrival, McCaskell was informed that appellant "had confessed and had said that the bodies were buried in that same general area." McCaskell was unable to locate the bodies because "[t]he details that [he] received were fairly generic" and "it was very dark when [they] got there," despite the fact that they were "[p]robably a few hundred yards" from where the bodies were ultimately found.

Carroll testified at the suppression hearing that he and appellant went into the bathroom at the Tyler Police Department at about 8:30 p.m. During their bathroom conversation, which lasted about forty-five minutes to an hour, appellant told Carroll how he had killed the victims and where he had buried them. After their bathroom conversation, they went to Detective Cashell's desk "because [appellant] agreed to show [them] on a map exactly where the bodies had been buried." They "got on MapQuest on the computer" and appellant "pointed out to [them] where the bodies were." Carroll called Sergeant John David Thornton around 11:30 p.m. and relayed to him appellant's description of the burial location.

Thornton testified that police thereafter searched the area described by Dodd and appellant but were unable to locate the bodies. He testified, "[W]e originally couldn't find the exact location based on the information we were getting, but we thought we were in the

right location, and that would have been finally somewhere around 2:00 or 3:00 in the morning." Shortly after daylight, Thornton and another officer made a "walk-through" of the area. They did not locate the bodies, although they "walked within 20 to 30 feet" of where the bodies were later found.

Carroll testified that appellant rode back to Fort Worth with him and Officer Thornhill later that morning. Appellant agreed to take them to where the victims were buried. They made "small talk" on the way and appellant expressed that he did not want "to see the bodies" or "to be seen by the media." Before they reached the highway exit they planned to take, appellant "guided [them] in through a back way to the same location." Carroll further testified:

> So as we pulled in -- the night before he described that as we pull into this gate, just about a few yards into the gate to the left there will be two barbed-wire fences. Over that second set of barbed-wire fences will be some shrubbery and a fresh dug grave he described and loose shrubbery on top of it.

> As we entered the gate and drove a little bit to the left, I saw such a mound of debris, but farther down I saw a second such description.

> So [appellant] said -- he looked at that one and made the comment to me that he thought that was it. Then he said, "Wait, wait. Go further down."

> So we drove to the second mound. We looked at that one for a minute and then [he] said, "No, back up." So we started to back up.

> At that point I got out of the truck and went over the fence. As I went over the fence, [appellant] is yelling instructions to me; also Officer Thornhill is standing near the truck, so he's relaying information to me also of what he's telling me, to walk further to my left, walk further to my left as I was going back toward that first mound of debris, and that's where I found the bodies.

Following the suppression hearing, the trial court made findings of fact and conclusions of law regarding appellant's unrecorded oral statements "in the restroom," "while employing the computer to explain the location of the bodies," and "on the way back to Fort Worth on February 22 directing the detectives to the location of the bodies." The trial court concluded that the statements were admissible because they "were revealed by the evidence to be true and conduced to establish the guilt of the Defendant by leading to the finding of evidence previously unknown to law enforcement officers."

Appellant alleges that the Section 3(c) exception does not apply to his oral unrecorded statements. This exception applies to "any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused such as the finding of secreted or stolen property or the instrument with which he states the offense was committed." *Dansby v. State,* 931 S.W.2d 297, 298 (Tex. Crim. App. 1996). "Found to be true" means facts about which the police were unaware at the time of the confession which are later, after the confession, found to be true. *Id.* at 298-99. Appellant argues that Dodd told police where the bodies were buried before appellant did; thus, appellant's statement did not contain facts unknown to police and later found to be true.

We previously addressed similar facts in another case:

In *Santana v. State,* 714 S.W.2d 1 (Tex. Crim. App. 1986), police questioned both Santana and his codefendant independently when both were arrested shortly after a robbery-murder. The codefendant was interviewed first and told police the murder weapons could be found in a field. Santana also told police

the location of the weapons. Later, the guns used in the murder were found in the field both men had described. Santana argued that his oral statement did not fit within the exception of section 3(c) because police already knew the location of the weapons when they questioned him, having learned this information from their prior interview of the codefendant. We rejected this claim, holding that until police actually found the weapons, they were unable to verify the truth of Santana's and his codefendant's assertions; thus, neither statement was "found to be true" until the discovery occurred.

*Dansby,* 931 S.W.2d at 299. In *Santana,* we stated: "The fallacy with appellant's argument is that at the time appellant gave his oral statement, the police had not ascertained that [his co-defendant's] statement as to the location of the weapons was true." 714 S.W.2d at 14. Here, the police had not ascertained Dodd's statement to be true at the time appellant gave his oral statement. The police did not locate the bodies until appellant came to the scene the next morning and specifically pointed out the grave.[5] As we said in *Santana,* "This situation falls directly into the category of admissible statements outlined in Article 38.22, Section 3(c)." *Id.* The trial court did not abuse its discretion in admitting appellant's oral statements. Points of error four, five, and six are overruled.

## SPOUSAL PRIVILEGE

In his seventh point of error, appellant claims that the trial court violated his confidential communication privilege by admitting the digitally recorded video conversation between him and his wife Trish at the Tyler Police Department. Rule 504 of the Texas Rules of Evidence provides that a person has a privilege during marriage and afterwards to refuse

---

[5] In *Santana,* the defendant "did not add any additional information to the statement already obtained from [his co-defendant]." 14 S.W.2d at 14. Here, it appears that appellant's description of the burial location was more detailed than the one given by Dodd.

to disclose and to prevent another from disclosing a confidential communication made to the person's spouse while they were married. TEX. R. EVID. 504(a)(2). A communication is confidential if it is made privately by any person to the person's spouse and it is not intended for disclosure to any other person. TEX. R. EVID. 504(a)(1). An exception applies "[i]n a proceeding in which the party is accused of conduct which, if proved, is a crime against the person of the spouse, any minor child, or any member of the household of either spouse." TEX. R. EVID. 504(a)(4)(C).

Following the suppression hearing, the trial court made findings of fact and conclusions of law, which stated in pertinent part (with citations omitted):

> The conversation between the Defendant and his wife, Trish, which was recorded and admitted into evidence was not a privileged confidential communication between husband and wife under Texas Rules of Evidence 504. There is an exception to the spousal privilege where the defendant is charged with a crime against a minor child. The spousal privilege does not prohibit the introduction of evidence of out of court statements made by the spouse. The Defendant was aware that he was being recorded. The Defendant had no right or expectation of privacy in the situation of his confinement when the conversations with his wife took place. The statements made by the Defendant during this segment of the DVD were not the product of custodial interrogation.

Appellant disputes that his conversation with his wife Trish fell under the "crime against any minor child" exception to the confidential communication privilege. Appellant asserts that the exception does not apply here because Trish was unaware at the time of their conversation that appellant was accused of killing a minor child.[6]

---

[6] Appellant relies on the following testimony of Detective Carroll on direct examination

(continued...)

The conversation between appellant and Trish was not made "privately." *See* TEX. R. EVID. 504(a)(1). Their conversation took place in a police station interview room while the digital video recorder was running. *See State v. Scheineman*, 77 S.W.3d 810, 812-813 (Tex. Crim. App. 2002). Even if the conversation could be considered a privileged "confidential" communication, it would still be admissible pursuant to the exception for a crime against any minor child. Appellant was accused of conduct which, if proved, constituted a crime against a minor child, seven-year-old Jayden. *See* TEX. R. EVID.

---

[6](...continued)
by the prosecutor during the guilt/innocence phase of trial:

> Q. So [Trish] enters the room. How did that come to be?
>
> A. After I had completed my interview, she wanted to talk to [appellant]. I told him that she could come in and talk to him. He had already confessed to killing Lisa, Jayden; and I went out and met with her in the lobby, told her what had happened, he wanted to speak to her, asked her if she wanted to speak to him; she said she did.
>
> Q. Is that the matter that he was just referring to, "Can I talk to her, please?" Is that what he was talking about?
>
> A. Yes.
>
> Q. Before you escorted her into that room, did you tell her that he had confessed to killing Lisa?
>
> A. Yes.
>
> Q. Did you tell her before she entered that room that he had confessed to killing Jayden?
>
> A. No.

We further note that appellant and Trish talked about Lisa's murder during their recorded conversation, but they made no mention of Jayden's murder.

504(a)(4)(C). Trish's ignorance of this fact is of no consequence. The applicability of this exception does not depend on the knowledge of appellant's spouse. Point of error seven is overruled.

## CONSTITUTIONALITY OF ARTICLE 37.071

In his ninth point of error, appellant claims the Texas death penalty statute violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it fails to require the State to prove the mitigation issue beyond a reasonable doubt, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002). We have previously rejected this claim, and we decline to revisit it here. *Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App.), *cert. denied,* 127 S. Ct. 836 (2006); *Blue v. State*, 125 S.W.3d 491, 500–01 (Tex. Crim. App. 2003). Point of error nine is overruled.

We affirm the judgment of the trial court.


DELIVERED DECEMBER 10, 2008

DO NOT PUBLISH