**AFFIRMED as MODIFIED; and Opinion Filed March 27, 2024.**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-22-01119-CR

**CARRENDIUS WALKER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F19-76545**

## MEMORANDUM OPINION

Before Justices Garcia, Breedlove, and Kennedy
Opinion by Justice Kennedy

A jury found appellant, Carrendius Walker, guilty of capital murder. The State did not seek the death penalty, so the trial court sentenced appellant to life imprisonment without parole. In nine issues, appellant challenges (1) the sufficiency of the evidence to support his capital murder conviction, (2) the trial court's evidentiary rulings, and (3) various aspects of the jury charge. In a cross issue, the State asserts that the judgment should be modified to properly reflect the sentence imposed. We affirm the trial court's judgment as modified herein. Because all issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

BACKGROUND

Appellant was indicted for the capital murder of Brian Harp, the owner of Café Delicious. The indictment alleged appellant intentionally caused Harp's death by shooting him with a firearm while in the course of committing and attempting to commit the offense of robbery. Appellant pleaded "not guilty" to the charged offense and proceeded to trial before a jury.

The State's witnesses at trial included David Abrom, an accomplice to the offense who acknowledged that he was testifying in exchange for an offer of a twenty-two-year sentence on a reduced murder charge.[1] Other witnesses for the State included various law enforcement officials and civilians involved in the investigation of the murder, and many others. The defense did not call any witnesses. The defense's theory appeared to be that Abrom was not credible, and the State did not corroborate his testimony.

## I.    Accomplice Witness Testimony as to Pre-Arrest Events

Abrom's testimony established the following. On the morning of September 25, 2019, Abrom received a call from Eric Curtis, also known as "Nine" and "Rondo," telling him that he needed some help. Abrom retrieved his assault rifle from his "baby mama's house" and went to South Dallas to meet Curtis. When he arrived, Curtis was in a silver Mercedes, that he often drove, with three other men:

---

[1] The record reflects that Abrom had numerous convictions and was a former gang member of 330 and the Goom Squad.

appellant, also known as "K.D."; James Moore, also know as "Beamer"; and an individual identified only by his nickname "Third." Appellant was in the driver's seat, Curtis was in the passenger seat, and Moore and Third were in the back seat, with Moore behind appellant and Third behind Curtis. Abrom got into the back seat and sat between Moore and Third. Everyone in the car was armed: Abrom, appellant, and Curtis carried assault rifles, and Moore and Third carried handguns. After he got in the car, Abrom learned the plan was to commit a robbery at a restaurant called Café Delicious. Abrom understood the restaurant was a store front for gambling and drugs and that appellant and Curtis had previously been to Café Delicious to gamble and buy drugs. "Trick dice" had reportedly been used at the restaurant, and appellant was upset because he "got hit."

The group arrived at the restaurant around noon. Appellant pulled into a parking spot and then backed into the spot, so that it would be easy to get away. Moore went inside the restaurant to "scope it out" while the others remained in the vehicle. There were only a few people inside the restaurant. Moore returned to the vehicle and reported what he saw. Moore remained with the vehicle while the other men went inside the restaurant. Appellant wore a green mask, and Curtis wore a black mask. Appellant wore a mask because people at Café Delicious knew him and he did not want to be recognized. The group split up once they were inside the restaurant. Abrom went to the back of the restaurant, Curtis went to the dining area where a man with money and drugs was sitting, and appellant and Third went to an

–3–

office on the side of the restaurant. Abrom found the restaurant's owner, Brian Harp, in the back, forced him to the ground, and searched him. Abrom then directed Harp to the area behind the counter and followed him with his gun to Harp's back. As Harp walked with both hands in the air, appellant appeared from around the corner and fired his rifle at Harp. Harp fell to the ground, and the group ran out of the restaurant. Everyone returned to the Mercedes and Moore, now in the driver's seat, drove them away from the scene and to Curtis's girlfriend's apartment, the spot where they hang out, where they divided money and drugs that were taken during the robbery. After they left the restaurant, appellant discovered that he had lost his flip phone. He did not know where he lost it. They all looked for it in the apartment and in the Mercedes, and Curtis called the phone's number in an effort to see if he could locate it.

Surveillance videos of the restaurant and the parking lot were admitted into evidence, published to the jury,[2] and snippets of same were shown to the jury with Abrom identifying the Mercedes pulling into the parking lot of Café Delicious as Curtis's car; indicating snippets of the videos show the car backing into a parking

---

[2] The videos of the parking lot showed the Mercedes arriving; a man exiting the vehicle from the back driver's side of the car and returning, and then four men leaving the car; the driver wearing a green mask, the passenger wearing a black mask, and two individuals from the back seat wearing hoodies. The videos also showed the men getting back into the car, the man wearing the green mask getting into the back seat behind the driver, the men in the hoodies getting into the back seat from the right side of the vehicle, and the man wearing the black mask getting into the passenger seat. The videos from inside the restaurant showed Harp with his hands in the air, Abrom backing away, and Harp being shot by the individual wearing the green mask.

spot, Moore leaving the vehicle, Moore coming back to the vehicle, Curtis getting out of the front passenger seat, Third getting out of the back seat on the passenger side, himself getting out of the middle of the back seat from the right side of the vehicle, appellant getting out of the driver's seat, people running to the car, appellant running to the left side of the vehicle, Third followed by Abrom running to the right back side of the vehicle, and Curtis carrying a bag. Abrom confirmed that a minor switch up in the positioning of the individuals in the car occurred, with Moore becoming the driver and appellant sitting in the driver's side back seat where Moore had been sitting when they arrived.

With respect to snippets from the surveillance videos of the inside of the restaurant, Abrom indicated some of them showed Moore walking into the restaurant; Moore walking out of the restaurant; Curtis, appellant, Abrom, and Third walking into the restaurant; and the shooting. Abrom identified Harp as the man with his hands in the air in the video. Abrom indicated that he was startled and shocked when Harp was shot. At first he thought he had also been shot. Abrom identified the person wearing the green mask, the person who shot Harp, as appellant and confirmed that the video showed appellant was wearing gloves at the time of the offense.

## II.     Other Evidence Presented Concerning Pre-arrest Events

Through Detective Frank Serra, the lead detective in the investigation of the offense, and other law enforcement officials, the State established the following. A

–5–

call went out to 9-1-1 at 12:20 p.m., and police and paramedics were dispatched to the scene, followed by crime scene investigators and Detective Serra. Among the items collected at the scene were two fired shell cases on the floor behind the counter and a flip phone in the parking lot. Detective Serra viewed footage from the restaurant's surveillance cameras and saw how the offense occurred. He also viewed video of the parking lot.

Detective Serra testified that various screenshots from the videos that were admitted into evidence showed that the flip phone they found in the parking lot of Café Delicious was not there before the suspect vehicle arrived. In addition, Detective Serra established that in viewing the videos he determined no one walked between the suspect vehicle and the vehicle parked next to it between the time the vehicle arrived and left. The flip phone was found on the driver's side of the vehicle, the side of the vehicle where the man in the green mask exited and returned to the vehicle. In addition, Detective Serra explained that video footage of the parking lot showed an ICN number on the windshield of the Mercedes. ICN numbers are assigned to vehicles that have been impounded by the City of Dallas, so Detective Serra was able to use the ICN number to discover the vehicle had been impounded on September 14, 2019, and was registered to Quintavia Johnson, Curtis's girlfriend.

On the evening of the murder, a number of undercover officers conducted surveillance outside of the apartment listed as the address for Johnson on her vehicle registration. The officers observed the Mercedes as well as a black Chrysler 300 and

–6–

a dark green Honda Accord at that location. The officers also observed various armed individuals go back and forth from the three cars to the apartment and what appeared to be an individual searching the Mercedes. The officers contacted patrol Officer Matthew Gronau and his partner about the Mercedes and its suspected involvement in the murder of Harp.

Later that night, Officer Gronau and his partner conducted a traffic stop of the Mercedes on the basis of a missing front license plate. Johnson was the only occupant of the vehicle. The officers detained Johnson on traffic violations and impounded the vehicle. An inventory search of the vehicle revealed a number of identification cards, a black face mask and a green Ninja Turtle mask. One of the identification cards bore the name of Eric Curtis. Officer Gronau's body cam video was played for the jury.

That same night, Detective Serra obtained a search warrant for the apartment they had been surveilling and arranged for a SWAT team to execute same due to the violent nature of the murder of Harp and the number of individuals and weapons involved. As the SWAT team arrived at the apartment complex, individuals carrying firearms got into vehicles and began to leave. One person took off running from police officers and was shot and killed. That person was later identified as Curtis.

Sometime between midnight and leading into the morning of September 26, officers conducted a traffic stop of the dark green Honda Accord that had previously been seen at the apartment complex. Abrom was one of the vehicle's occupants, and

he was wearing the same clothes that were seen on one of the suspects in the restaurant's surveillance video. Abrom was arrested and taken to police headquarters, where he waived his rights and spoke with Detective Serra.

### III. Accomplice Evidence Concerning Post Arrest Events

Abrom indicated that during his first interview with Detective Serra he was not completely honest because he was high. After he terminated the interview and was taken to jail, he called his girlfriend and discovered police had searched her apartment and found the assault rifle he carried during the robbery. He asked his girlfriend to reach out to Detective Serra to schedule another interview. Abrom claimed he was honest with Detective Serra during the second interview and that after he told Detective Serra what had happened, Detective Serra showed him some snippets of the surveillance videos and screenshots. Abrom did not see all of the surveillance videos until the Friday before the trial started. Abrom was able to identify the people in the screenshots Detective Serra showed him. With respect to how to locate appellant, Abrom indicated that appellant drove a black Cadillac and that a day or two before the offense he ran from the law.

### IV. Non-Accomplice Evidence Concerning Post Arrest Events

According to Detective Serra, during his first interview Abrom admitted to being in the Mercedes on the date of the murder and identified the nicknames of individuals he had been with that day, including Nine, Ten, Rondo, Third, Beamer, and Kodak. Detective Serra showed Abrom still shots of people getting out of the

car and a snippet from the surveillance video showing the shooting. A few days later, Detective Serra received a phone call from a family member telling him Abrom wanted to give another statement. During the second interview, Abrom told Detective Serra the details of what happened on September 25, how Curtis called him that morning, how he and his accomplices gathered at a location in South Dallas, why they targeted Café Delicious, how they drove to the location in Curtis's girlfriend's silver Mercedes, where the individuals were situated within the vehicle when they arrived and when they left, what happened when they arrived at the restaurant, and where they went after leaving the restaurant. Detective Serra showed Abrom screenshots from the surveillance videos. Abrom identified some of the people in the screenshots and gave the nicknames of Third, K.D., Beamer, and Rondo. Abrom indicated that appellant put on a green face mask before entering the restaurant. While police may have mentioned to Abrom that a phone was found at the crime scene, it was Abrom who described the phone as a flip phone. Abrom indicated that when appellant realized he had lost his phone, Curtis called the number to see if they could find same. Abrom gave Detective Serra permission to look at his phone. Detective Serra, in searching Abrom's phone, discovered calls between Curtis and Abrom on the day of the offense.

After the second interview with Abrom, Detective Serra examined the flip phone that had been retrieved from the restaurant's parking lot. He saw that the phone had connected with several phone numbers on the date of the murder,

including numbers associated with phones belonging to appellant's mother and appellant's girlfriend. He also found text messages in which the phone's owner was identified as Carrendius or K.D. and saw that a call had been placed by Curtis's phone to the flip phone roughly an hour after Harp was murdered, corroborating what Abrom said about Curtis calling appellant's phone after they left the restaurant and when appellant could not find his phone, and about appellant's involvement in the robbery and murder. Appellant's girlfriend, Shaquai Johnson, called the flip phone at 10:52 a.m. and 11:55 p.m. on the day of the offense. There were multiple missed calls on the day of the murder indicating there was no successful communication with the device after the murder.

A warrant issued for appellant's arrest. Officer Jason Kennedy executed the arrest warrant and seized a cell phone from appellant during the process. Officer Kennedy gave the cell phone to Detective Serra after transporting appellant to headquarters. An extraction of that phone revealed it had been activated on September 26, 2019, at 2:33 p.m. The first calls from the new phone were made to appellant's mother and girlfriend.

At headquarters, appellant waived his rights and spoke with Detective Serra. The interview was recorded. Portions of the videos of appellant's interview with Detective Serra were played for the jury. Detective Serra indicated that appellant did not admit to his part in the capital murder, but he did provide some information that was helpful to the investigation including the phone number for his mother,

which matched a number he found in the flip phone that had been left at the crime scene. Appellant did not deny that the phone was his and informed Detective Serra that he does not let anyone else use his phones, and that he is in sole possession of same. Appellant provided no explanation as to why the phone was found in the parking lot of Café Delicious. Appellant admitted that he made money by gambling and at first denied knowing Curtis but later admitted that he knew him. Detective Serra considered appellant's getting money by gambling to be significant because it was one of the components that factored into the offense at Café Delicious. Appellant spoke quite a bit to Detective Serra about Curtis being fatally shot and about attending a candlelight vigil for him. An extraction from the phone appellant had with him at the time of his arrest indicated appellant knew Curtis much more than he led on in his interview with Detective Serra. An extraction of that phone revealed a video that was taken at the candlelight vigil.

As part of the ongoing investigation, Detective Serra obtained the Instagram records for Moore and found a video that Moore had posted at 3:25 p.m. on the date of the offense. The video was played for the jury. The video was recorded from inside a vehicle by the driver of same. The video showed a Mercedes logo on the steering wheel and the same ICN number on the vehicle's windshield that was seen on the Mercedes in the video from the restaurant's parking lot. The video did not show the faces of the vehicle's occupants, but the driver was heard saying, "Man,

Fuck Third." The nickname "Third" had been previously provided by Abrom to Detective Serra.

At the close of evidence, the jury was instructed on the law of parties and the law regarding accomplice-witness testimony. The jury was instructed that Abrom was an accomplice as a matter of law and that it could not convict appellant unless it believed Abrom's testimony to be true, and there was other evidence tending to connect appellant to the capital murder. The jury found appellant guilty of capital murder, as charged in the indictment, and the trial court assessed the mandatory punishment of confinement for life without parole in the Institution Division of the Texas Department of Criminal Justice. TEX. PENAL CODE ANN. § 12.31(b)(2).

## DISCUSSION

### I. Accomplice Witness Testimony

In his first issue, appellant challenges the sufficiency of the evidence to support his conviction for capital murder.

In reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005). This is a highly deferential standard, as it is the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh evidence, and to draw inferences from basic

facts to ultimate conclusions. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

The State must prove (1) the offense was committed, and (2) the accused was the person who either committed or participated in the crime. *Johnson v. State*, 673 S.W.2d 190, 197 (Tex. Crim. App. 1984). Mere presence alone is not enough. *Id.* The standard of review for circumstantial-evidence cases on appeal is the same as for direct-evidence cases. *Alexander v. State*, 740 S.W.2d 749, 757 (Tex. Crim. App. 1987). In reviewing the sufficiency of the evidence to support a conviction based on circumstantial evidence, the evidence is viewed in the light most favorable to the verdict. *Flournoy v. State*, 668 S.W.2d 380, 383 (Tex. Crim. App. 1984). In a circumstantial evidence case, the State is not required to exclude every hypothesis that the criminal act may have been committed by another person. *Brandley v. State*, 691 S.W.2d 699, 703 (Tex. Crim. App. 1985). The State must exclude every reasonable hypothesis raised by the evidence that tends to exculpate the accused. *Id.*

Appellant concedes that the State's evidence shows appellant may have committed the offense, but he contends that his presence near the scene is insufficient to support his conviction. Appellant contends it was never established when his phone was left at the crime scene and claims, because the evidence showed he had been to Café Delicious to gamble prior to the offense, he could have dropped the phone on a previous occasion. Appellant urges there was no physical evidence that tied him to the crime scene. He claims because the only DNA evidence that

–13–

came back with certainty was that DNA of a hair taken from the green mask matched Abrom and no weapons or ammunition were found in the Mercedes and no firearm was recovered that matched the shell casings found at the scene, the evidence is legally insufficient to support his conviction.

Contrary to appellant's contentions, the State presented evidence that the flip phone was dropped at the scene of the crime after the Mercedes arrived and before it left and that the phone was dropped on the driver's side of the vehicle, the side where the video showed the individual wearing the green mask sat when they arrived and when they left. In addition, DNA evidence is not required to obtain a conviction. Our law relating to the sufficiency of evidence necessary to identify those criminally charged is demanding of certainty without limiting the state to specific forms or types of evidence. *See, e.g., g., Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (noting that DNA evidence was not required); *see also Williams v. State*, 196 S.W.3d 365, 369 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (affirming robbery conviction on sufficiency challenge where there was evidence available to support jury's finding, but no DNA evidence, no fingerprint evidence; no other witnesses (beside the complainant) to the robbery; no line-up performed; and where it was dark at the time of the robbery, likely limiting visibility of complainant); *see also Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) ("A rational jury could have found appellant guilty of aggravated robbery without DNA evidence, fingerprint

evidence, or evidence of the gun or cash Newby gave to appellant"). Thus, the fact that the State did not recover the murder weapon and had little in the way of DNA evidence is not dispositive of the issue of whether the evidence is sufficient to support appellant's conviction.[3]

We next address appellant's contention the State failed to corroborate Abrom's accomplice-witness testimony. An accomplice is someone who participates with the defendant before, during, or after the commission of an offense and acts with the required culpable mental state. *See Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). A conviction may not be based on the testimony of an accomplice witness unless the accomplice-witness testimony is corroborated by other evidence "tending to connect" the defendant to the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14.

The test to apply in determining sufficiency of the corroboration is to eliminate from consideration the testimony of the accomplice witness and then examine the testimony of the other witnesses to ascertain if there is inculpatory evidence which tends to connect the accused with the commission of the offense. *Cruz v. State,* 690 S.W.2d 246, 250 (Tex. Crim. App. 1985). This test does

---

[3] The forensic examiner with the DNA casework unit at the FBI Laboratory testified that the mitochondrial DNA analysis of one of the hairs extracted from the green mask revealed the sequence obtained from the hair was the same as that obtained from Abrom. Thus, Abrom could not be excluded as a possible contributor to that hair. In addition, she established that no more than 48.93 percent of African Americans would also be expected to match the small area of mitochondrial DNA obtained from the hair. Appellant could not be included or excluded as a match to the hair.

–15–

not require, however, that the corroboration directly link the defendant with the crime or that it be sufficient in itself to establish guilt. *Richardson v. State*, 700 S.W.2d 591, 594 (Tex. Crim .App. 1985); *Davis v. State*, 68 S.W.3d 273, 281 (Tex. App.—Dallas 2002, pet. ref'd). "Instead, any independent evidence verifying the accomplice's version as opposed to the defendant's version is corroborative, even if it only relates to a mere detail as opposed to a substantive connection between the defendant and the offense." *Davis*, 68 S.W.3d at 281. Furthermore, while presence alone is insufficient to corroborate an accomplice's testimony, presence coupled with other suspicious circumstances may constitute sufficient corroboration. *Id.* at 281–82 (citing *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999)).

The surveillance videos from the restaurant showed that five men arrived at the restaurant in a Mercedes that had an ICN number on its windshield. One man remained in the vehicle, after entering the restaurant and buying a soft drink, while the other four entered the restaurant carrying firearms. The murder occurred when a man wearing a green mask approached Harp, as Harp walked with a gun pointed at his back and his hands in the air, and shot him. The men then ran back to the Mercedes and left the scene.

The question presented at trial was whether appellant was one of the men depicted in the surveillance videos and the man who shot Harp. To corroborate Abrom's testimony concerning what transpired the day of the murder and to appellant's involvement, the State presented independent evidence through

–16–

surveillance videos, Moore's Instagram posting on the day of the murder, and the testimony of Detective Serra and Officer Gronau that the vehicle involved in the offense was a silver Mercedes belonging to Curtis's girlfriend and that a black face mask, a green Ninja Turtle mask, and an identification card bearing the name of Eric Curtis were recovered from the vehicle on the evening of the offense after Officer Gronau and his partner conducted a traffic stop. Through phones and phone call records, the State established appellant and Abrom had been in contact with Curtis the morning of the offense, thus connecting them to Curtis and the Mercedes.

Detective Serra recovered a flip phone from the parking lot of Café Delicious. The surveillance video of the parking lot shows the phone appeared at the scene some time after the Mercedes arrived and before it left and that the phone was located in between the spot where the Mercedes had been parked and another vehicle. The phone was on the driver's side of the Mercedes and no one else entered the space between the vehicles during the commission of the offense. A search of the flip phone tied the phone to appellant as it had connected to phone numbers belonging to appellant's mother and appellant's girlfriend and contained text messages that identified the owner of the phone as Carrendius and K.D. Appellant's jail book-in records, which were admitted into evidence, further confirmed the phone number associated with appellant's mother. In addition, the evidence showed Curtis's phone called the flip phone about an hour after the murder occurred, corroborating Abrom's testimony appellant lost his phone the day of the murder, they searched for same,

–17–

and Curtis called the phone in an effort to locate same. In addition, the evidence showed that during appellant's interview with Detective Serra he gave the detective his mother's phone number, which matched a number in the flip phone. Appellant did not deny the phone was his and insisted that he does not allow anyone else to use his phones and that he maintains sole possession of same. The evidence further established appellant had a different phone with him when he was arrested and the data extraction from that phone showed it as activated the day after the murder and the day after the flip phone was left at the crime scene.

The surveillance video from inside the restaurant showed the individual who shot Harp wore a green mask. The surveillance video of the parking lot showed the person wearing the green mask exited the vehicle from the driver's seat and when he returned, he got into the back seat behind the driver. Thus, the shooter was always on the side of the vehicle where appellant's flip phone was found. The video surveillance further showed the only other individual exiting and entering the vehicle from the driver's side of the car was the individual identified as Moore and he was not one of the individuals who went inside the restaurant when Harp was shot and killed. The surveillance video further showed the face of the individual identified as Moore as he entered the restaurant to "scope it out" and that individual was not appellant.

The State also presented evidence appellant admitted that he made money gambling and the State established through a cook from the restaurant that Harp

allowed drug sales and gambling at the restaurant because Harp needed money to pay bills. This evidence tied appellant to the restaurant and corroborated Abrom's testimony appellant wore a mask to hide his identify because people at the restaurant knew him.

Moreover, the surveillance video of the parking lot corroborated Abrom's account of where the individuals were located in the vehicle and who went into the restaurant.

After eliminating from consideration Abrom's testimony, and considering the surveillance videos; information Detective Serra was able to extract from the flip phone that was retrieved from the crime scene and confirmed by appellant's jail book-in records, tying the phone to appellant; the extraction of the cell phone appellant had with him when he was arrested, which had been activated the day after the murder and contained a video of Curtis's candlelight vigil; appellant's interview with Detective Serra; testimony concerning law enforcement's investigation of the offense; and the Instagram video posted on Moore's account, we conclude the non-corroborating witness evidence tended to connect appellant with the commission of the offense and verified Abrom's version of the events that occurred the day of the murder. Because sufficient evidence corroborated Abrom's testimony appellant was involved in the robbery and murder of Harp, we overrule appellant's first issue.

## II. Extraneous-Offense Evidence

In his second and third issues, appellant asserts the trial court erred in allowing the State to present evidence of an extraneous offense that occurred the day before the offense at issue here because it was not relevant or, if relevant, it was unduly prejudicial. *See* TEX. R. EVID. 404(b) (evidence of an extraneous offense may be admitted if relevant apart from tendency to prove the character of a person in order to show person acted in conformity therewith), 403 (evidence that is otherwise relevant may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."). In his sixth issue, appellant asserts the trial court erred in denying his request to strike from the record any evidence of the extraneous offense that the State introduced through Sergeant Casey Torrey because the State failed to subsequently demonstrate, as it indicated it would, through Detective Serra, the relevance of same.

The night before Harp was murdered, Sergeant Torrey of the Dallas City Marshal's Office, while in a marked squad car, attempted to conduct a traffic stop of appellant's black Cadillac XTS in what was considered to be a high-drug-traffic area after he observed the left front headlight to be out, and appellant and another individual reportedly abandoned the vehicle and fled on foot, leaving behind three cell phones and a debit card bearing appellant's name. The officer ran the vehicle's license plate and found the vehicle was registered to appellant.

The trial court held a hearing before swearing in the jury during which the State informed the court of its intent to introduce evidence of this extraneous offense of evading arrest or detention for the purpose of establishing identity and to corroborate Abrom's testimony that appellant drove a black Cadillac and had fled from the law a day or two before Harp was murdered. Appellant objected to the introduction of this evidence on the grounds of relevance and unfair prejudice. The trial court overruled appellant's objections and indicated that it would "allow testimony due to corroboration of accomplice testimony." When the State sought to introduce evidence of the extraneous offense during its examination of Sergeant Torrey, appellant renewed his relevance objection. In response, the State indicated that it would establish the relevancy of the evidence through Detective Serra, who had not yet testified. The trial court again overrule appellant's objection. After Detective Serra testified, appellant moved to strike the evidence of the extraneous offense urging the State had failed to establish the relevance of same through Detective Serra as promised. The trial court denied appellant's motion to strike.

We review a trial court's decision to admit extraneous offense evidence under an abuse of discretion standard. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). A court abuses its discretion when its decision is so clearly wrong that it lies beyond the zone within which reasonable persons might disagree. *Rachal v. State*, 917 S.W.2d 799, 807 (Tex. Crim. App. 1996).

Rule 404(b) of the Texas Rules of Evidence prohibits admitting extraneous offense evidence to prove a defendant acted in conformity with his character on a given occasion. TEX. R. EVID. 404(b). Evidence of extraneous offenses, however, may be admitted to show "motive, opportunity, intent, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* And evidence of extraneous acts may also be admitted to rebut defensive theories. *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996).

When faced with an objection under rule 404(b), the proponent of the evidence must demonstrate to the trial court that the evidence has relevance apart from its value to show character conformity. *Santellan v. State*, 939 S.W.2d 155, 168 (Tex. Crim. App. 1997). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. We will find a trial court's ruling on the admissibility of evidence to be reversible error only where the court abused its discretion and appellant has been harmed. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *see also* TEX. R. APP. P. 44.2(b).

To convict appellant of capital murder as charged by the indictment, the State had to prove, and the jury had to find he intentionally committed the murder in the course of committing or attempting to commit a robbery. PENAL § 19.03(a)(2). When identity is an issue in the case, an extraneous offense may be admissible to

show identity. *Lane*, 933 S.W.2d at 519; *Carter v. State*, 145 S.W.3d 702, 709 (Tex. App.—Dallas 2004, pet. ref'd). In order to be admissible, a two-part test must be satisfied. First, identity must be a contested issue in the case, and second, something unique must exist that connects the extraneous offense to the charged offense—some distinguish characteristic common to both the extraneous offense and the offense charged. *Siqueiros v. State*, 685 S.W.2d 68, 71 (Tex. Crim. App. 1985). A defense strategy aimed at challenging the State's proof of identity raises the issue of identity. *Id.*

In this case, while identity was a contested issue, the extraneous offense was completely different from the offense charged and, thus, did not satisfy the second prong of the test for the admissibility of extraneous offense evidence. We should not engraft exceptions to rule 404 that would allow extraneous offenses to be admitted when identity is an issue absent a direct connection between the charged and the extraneous offense. *Carter*, 145 S.W.3d at 710. As a result, we conclude the evidence was not properly admitted under rule 404(b) to prove identity or to corroborate Abrom's identification of appellant as being involved in the charged offense and the trial court abused its discretion by admitting same.

Having determined that the evidence of the extraneous offense was erroneously admitted, we must now decide whether the admission of this evidence was so harmful to appellant as to require a new trial. Here, the complained of error is not of constitutional dimension. *Id.* "Any [non-constitutional] error, defect,

–23–

irregularity, or variance [in a criminal case] that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). Thus, we must disregard the error if it did not affect appellant's substantial rights. *Id.* "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). However, "[a] criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Id.*

In assessing the likelihood that the jury's decision was adversely affected by the error, we consider the entire record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Id.* In addition, the weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis under rule 44.2(b). *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008); *Motilla v. State*, 78 S.W.3d 352, 356–57 (Tex. Crim. App. 2002). And we may consider the closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error. *Motilla*, 78 S.W.3d at 355–56; *Morales*, 32 S.W.3d at 867.

With respect to the magnitude of the harm resulting from the erroneous admission of the complained of evidence, appellant does not identify any specific

harm that resulted from Sergeant Torrey's testimony about appellant evading arrest the evening prior to the murder of Harp, rather he simply states, "The error was such that it denied Appellant due process a fair trial and was harmful as it placed evidence of bad character before the jury in a way that was wholly impermissible with the intent to prejudice Appellant before the jury which was to deny him a fair trial."

As we indicated in resolving appellant's first issue, the State introduced evidence corroborating Abrom's testimony with respect to the charged offense and the evidence of appellant's guilt on the capital murder charge was substantial. In addition to the substantial evidence of appellant's guilt of the capital murder, the record shows that the testimony regarding the extraneous offense consumed a minute portion of the State's case and neither side mentioned the extraneous offense during closing arguments. *See, e.g.*, *Smith v. State*, No. 06-21-00087-CR, 2022 WL 2027006, at *9 (Tex. App.—Texarkana June 7, 2022, no pet.) (mem. op., not designated for publication) (holding the admission of the extraneous-offense evidence was harmless because, among other reasons, the extraneous offense was "barely a part of the trial," and the State did not mention it during closing arguments). We conclude the admission of the extraneous offense evidence likely did not influence the jury or had but a slight effect. Accordingly, we overrule appellant's second, third, and sixth issues.

### III.   Jail Records

In his fourth issue, appellant argues the trial court erred in overruling his objection to State Exhibits 168, 169, and 170.  State Exhibit 168 is a copy of appellant's AIS (Adult Identification System) book-in dated October 1, 2019.  The exhibit, as introduced into evidence, contained basic information such as appellant's date of birth, height, weight, last known address, and emergency contact and phone number.  State Exhibits 169 and 170 were spread sheets of jail phone call records showing the date, time, and duration of calls associated with appellant's personal identification number and the phone number identified on the AIS as belonging to appellant's emergency contact, his mother, and calls to the phone number associated with appellant's girlfriend.  The calls were placed between October 7, 2019, and November 5, 2019.  Appellant objected to these exhibits on the grounds that they reminded the jury that he was incarcerated for about a one-month period.

On appeal, appellant contends this evidence was prejudicial and inadmissible under Texas Rule of Evidence 403.  Preservation of error is governed by Rule 33.1 of the Texas Rules of Appellate Procedure, which provides that, to preserve error, a complaint must be "made to the trial court by a timely request, objection, or motion that ... state[s] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."  TEX. R. APP. P. 33.1(a)(1)(A).  Regarding its specificity, the objection must simply be clear enough

to provide the judge and the opposing party an opportunity to address and, if necessary, correct the purported error. *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009). No "magic words" are required. *Id.* An objection is considered in the context in which the complaint was made and the parties' shared understanding of the complaint at that time. *Lankston v. State*, 827 S.W.2d 907, 911 (Tex. Crim. App. 1992).

Assuming, without deciding, appellant's objection at trial was sufficient to preserve his rule 403 complaint, we conclude the trial court did not abuse its discretion in admitting the complained of exhibits.

Rule 403 states that evidence that is relevant may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. "Unfair prejudice refers not to an adverse or detrimental effect of evidence but to an undue tendency to suggest a decision on an improper basis, commonly an emotional one." *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007).

The State introduced State Exhibits 168, 169 and 170 through Raul Obregon, a criminal investigator for the Dallas County District Attorney's office, who testified that as part of his duties as an investigator he pulls jail calls. He testified he pulled the jail calls associated with appellant and he identified the phone numbers on State Exhibits 169 and 170 as belonging to appellant's mother and girlfriend. Appellant's counsel did not cross examine Obregon. Appellant contends that this evidence "was

clearly calculated to inflame the minds of the jury that it would be impossible to remove the harmful impression from their minds that it denied appellant's right to a fair trial."

Prior to the offer of State Exhibits 168, 169 and 170, Officer Kennedy testified that he arrested appellant on the morning of October 1, 2019, the date listed on the AIS sheet. Officer Kennedy testified that he transported appellant to headquarters. From this testimony, the jury could have inferred appellant went to jail at that time. The jail call logs identify a relatively short period of time during which appellant was making calls from the jail. We conclude appellant he has failed to establish the introduction of this evidence had an undue tendency to suggest a decision on an improper basis. We overrule appellant's fourth issue.

## IV.   Instagram Video

In his fifth issue, appellant urges the trial court erred when it allowed the State to present the eight-second video posted on Moore's Instagram account on the day of the offense. Appellant contends that doing so deprived him of his right to confront the witness and claims the video was not relevant to this case. The specific exhibits about which appellant complains are State Exhibits 190, 203, and 204, which were introduced during the State's examination of Detective Serra. Appellant objected to this evidence as hearsay and violative of the confrontation clause.

State Exhibit 190, the video from Moore's Instagram account, shows an individual driving a vehicle with a Mercedes Benz logo on the steering wheel and a

location number 84-10 on the windshield matching the CIN number shown on the suspect vehicle in the surveillance video. The State urged that this CIN number kicked off the investigation that ultimately led to the arrest of appellant. The State indicated that it was offering this evidence to corroborate Abrom's testimony about the group traveling in a Mercedes belonging to Curtis' girlfriend and his identification of Moore as the getaway driver and for the additional purpose of that the clip references the unnamed individual known as "Third." The State offered Exhibits 203 and 204, Meta Platforms Business Records for the Instagram account, to establish the date the video was posted and to identify Moore as the individual associated with the account and the post.

The Confrontation Clause guarantees a criminal defendant the right to be confronted with the witnesses against him. U.S. CONST. amend. VI; *Garcia v. State*, 149 S.W.3d 135, 140 (Tex. Crim. App. 2004). The Confrontation Clause prohibits the admission of testimonial hearsay against a defendant unless the declarant was unavailable, and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 31, 68 (2004); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). "[A] hearsay statement is testimonial when the surrounding circumstances objectively indicate that the primary reason the statement was made was to establish or prove past events potentially relevant to later criminal prosecution." *Walter v. State*, 581 S.W.3d 957, 981 (Tex. App.—Eastland 2019, pet. ref'd). Hearsay is a statement, other than one made by the declarant while

–29–

testifying at trial, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). A statement is an oral or written expression, or nonverbal conduct that a person intended as a substitute for verbal expression. TEX. R. EVID. 801(a).

The video in State Exhibit 190 is eight seconds in length, and some discernible voices are detected in the background. The State did not offer the video to prove the truth of any statements that might have been discernible. The State offered the video to show that Moore was behind the wheel of the Mercedes with his accomplices on the date of the murder corroborating Abrom's testimony on the matter. Therefore, the hearsay rule did not preclude its admission. Accordingly, the admission of Exhibit 190 did not violate the Confrontation Clause. With respect to Exhibits 203 and 204, appellant's complaints urging the date and time the video was posted does not conclusively establish that the video itself was recorded on that date or that Moore actually posted the video, go to the weight of same, and not their admissibility. We overrule appellant's sixth issue.

## V.   Jury Argument

In his seventh issue, appellant contends the trial court erred in overruling his objection to the prosecutor's jury argument that appellant was not going to own up and admit it. Appellant contends that this statement amounted to a comment on appellant's failure to testify that impeded his Fifth Amendment right. We disagree.

We review a trial court's ruling on an objection to jury argument for an abuse of discretion. *Milton v. State*, 572 S.W.3d 234, 241 (Tex. Crim. App. 2019). A trial

court abuses its discretion when its ruling falls outside the zone of reasonable disagreement. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018).

There are four proper areas of jury argument: (1) summation of the evidence; (2) a reasonable deduction drawn from that evidence; (3) an answer to opposing counsel's argument; and (4) a plea for law enforcement. *See Milton*, 572 S.W.3d at 239. A comment on a defendant's failure to testify violates both the state and federal constitutions as well as Texas statutory law. *See* U.S. Const. amend. V; TEX. CONST. art. I, § 10; CODE CRIM. PROC. art. 38.08; *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011). To rise to the level of such violation, the comment must clearly refer to the accused's failure to testify, and it is not sufficient if it might be construed as an implied or indirect allusion. *Canales v. State*, 98 S.W.3d 690, 695 (Tex. Crim. App. 2003). The test is whether the language used was manifestly intended or was of such character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. *Id.*

The comment appellant refers to was made by the prosecutor toward the end of the State's opening closing argument and while he discussed Detective Serra's interview of appellant:

> Detective Serra, who did a fantastic job, I believe, interviewing [appellant], he was never going to admit it. Because it was days after, he knew what was coming, and he knew - -

Defense counsel interrupted at that time stating, "Your Honor, I am going to object. It impedes upon the defendant's Fifth Amendment right not to testify." The trial

–31–

court overruled the objection. The prosecutor then continued,

> He knew what was coming, because he left his phone at the scene. If his story make[s] sense. Did he own up to anything, the gun in the house. He blamed it on the dog. Did he say his nickname? He does not own anything and he is not going to give anything up to Detective Serra, no matter how long, even if they were still in there sitting today.

The comment about which appellant complains clearly referred to appellant's unwillingness to cooperate and provide information to Detective Serra. It was not a comment on his failure to testify at trial. The prosecutor's comment was not of such a character that the jury would necessarily and naturally take it as a comment on appellant's failure to testify. Accordingly, the trial court did not abuse its discretion in overruling appellant's Fifth Amendment objection. We overrule appellant's seventh issue.

## VI. Jury Charge

### A. Lesser Included Offense

In his eighth issue, appellant asserts the trial court erred in denying his request to instruct the jury on the lesser-included offense of felony murder. Appellant contends he was entitled to the instruction because a jury could have found he did not have the specific intent to shoot and kill Harp.

To determine whether a defendant is entitled to an instruction on a lesser-included offense, a two-step test applies. *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007). The first step is to determine whether the offense is actually a lesser-included offense of the offense charged. *Id.* Felony murder is a lesser-

included offense of capital murder. *See Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999); *see also* PENAL §§ 19.02(b)(3) & 19.03(a)(2). Accordingly, the first prong of the test is satisfied.

The second step of the test requires that the record contain some evidence that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Hall*, 225 S.W.3d at 536. The evidence must establish the lesser-included offense as "a valid rational alternative to the charged offense." *Segundo v. State*, 270 S.W.3d 79, 91 (Tex. Crim. App. 2008); *see also Rice v. State*, 333 S.W.3d 140, 146 (Tex. Crim. App. 2011). We review all of the evidence presented at trial. *Hayward v. State*, 158 S.W.3d 476, 478–79 (Tex. Crim. App. 2005). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). In determining whether the evidence raises the requested lesser-included offense, we do not consider the credibility of the evidence or whether it conflicts with other evidence. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).

A person commits *capital murder* if the person intentionally causes the death of an individual while in the course of committing or attempting to commit certain enumerated felonies, in this case robbery. PENAL § 19.03(a)(2); *Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1993). A person commits *felony murder* if the person:

commits or attempts to commit a felony, other than manslaughter, and in the course of or in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

PENAL § 19.02(b)(3); *Murphy v. State*, 665 S.W.2d 116, 119 (Tex. Crim. App. 1983).

The difference between capital murder and felony murder is that capital murder requires the specific intent to kill, and felony murder requires only the intent to commit the underlying felony. *See Fuentes*, 991 S.W.2d at 272 ("The distinguishing element between felony murder and capital murder is the intent to kill."); *Santana v. State*, 714 S.W.2d 1, 9 (Tex. Crim. App. 1986) ("The only difference in the two offenses is the culpable mental state. In capital murder, there must be an intent to kill, while in the felony murder, there must only be an intent to commit the underlying offense, in this case robbery."); *see also Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (felony murder is an unintentional murder committed in the course of a felony). As a result, in order for appellant to be entitled to a felony-murder instruction, the record must contain some evidence that would permit a rational jury to find appellant intended to commit a robbery but unintentionally caused Harp's death by committing an act clearly dangerous to human life. *See Fuentes*, 991 S.W.2d at 272; *Taylor v. State*, No. 05-12-00540-CR, 2013 WL 4081422, at *12 (Tex. App.—Dallas Aug. 13, 2013, pet. ref'd).

During the jury charge conference, appellant urged that a lesser-included instruction should be given because (unspecified) statements made by the detective

–34–

in his interview with appellant and an interpretation of the surveillance video that shows appellant behind the counter could lead a jury to find appellant did not have the specific intent to shoot and kill Harp. The trial court denied appellant's request noting, "Court is of the opinion that there wasn't any evidence of the lesser included, primarily because based on the tape, [appellant] admitted that he did not know anything about the offense, wasn't there, so I am going to deny that request."

The evidence at trial showed appellant and his accomplices drove to Café Delicious with the intent to commit a robbery. Appellant and three of his accomplices entered the restaurant carrying firearms. The surveillance video of the shooting, along with Abrom's testimony, showed Harp was walking with both hands in the air and a gun to his back when Harp was shot point blank. One of the bullets hit Harp on the left side of his chest and caused his death. These facts establish appellant acted intentionally when he shot and killed Harp. The evidence in the record concerning appellant's intent at the time of the shooting does not accord with robbery alone. *Taylor*, 2013 WL 4081422, at *12. Given the evidence in this case, a rational jury could not have concluded that, at the time of the shooting, appellant intended only to rob, and not kill, Harp. Accordingly, appellant has not satisfied the second prong of the *Hall* test, and the trial court did not err in denying his request for a jury instruction on the lesser-included offense of felony murder. We overrule appellant's eighth issue.

### B. Reasonable Doubt

In his final issue, appellant claims the trial court erred in overruling his objection to the jury charge including what he characterizes as a definition of reasonable doubt. The complained of language, which was included in the "Presumptions and Burden of Proof" portion of the jury charge, is as follows:

> It is not required that the State prove the defendant's guilt beyond all possible doubt; it is required that the State's proof excludes all "reasonable doubt" concerning the defendant's guilt.

Appellant contends that this phrase is a prohibited definition under *Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000). We disagree.

Appellate review of an alleged error in the jury charge involves two steps. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). The first step is to determine if the jury charge was erroneous. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015); *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If erroneous, the next step is to determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005).

As an initial matter we note that *Paulson* did not involve the particular instruction about which appellant complains here. And, in *Woods v. State*, the Texas Court of Criminal Appeals considered a charge that included essentially the same instruction that is at issue here and held it did not violate *Paulson* because the charge did not include the definitions criticized by the court in *Paulson*. *Woods v. State*,

–36–

152 S.W.3d 105, 115 (Tex. Crim. App. 2004) (considering the instruction, "It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all 'reasonable doubt' concerning the defendant's guilt"); *see also Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010) (reaffirming holding in *Woods*).  This Court has considered this instruction as well and has held that it does not violate *Paulson* because it does not define "reasonable doubt."  *See, e.g.*, *Bullock v. State*, 673 S.W.3d 758, 767–68 (Tex. App.—Dallas 2023, no pet.); *Thomas v. State*, No. 05-19-00347-CR, 2020 WL 2988639, at *7 (Tex. App.—Dallas June 4, 2020, pet. ref'd) (mem. op., not designated for publication); *McDaniel v. State*, No. 05-15-01086-CR, 2016 WL 7473902, at *6–7 (Tex. App.—Dallas Dec. 29, 2016, pet. ref'd) (mem. op., not designated for publication); *O'Canas v. State*, 140 S.W.3d 695, 702 (Tex. App.—Dallas 2003, pet. ref'd).  Accordingly, we conclude that the specific language about which appellant complains did not define reasonable doubt and thus, its inclusion in the jury charge is not error.  *See O'Canas*, 140 S.W.3d at 701–02.  We overrule appellant's ninth issue.

## VII.  Modification of Judgment

By cross issue, the State urges the sentence listed in the judgment should be modified to correctly reflect that appellant was sentenced to "life without parole," instead of "life."  The record reflects that the judge pronounced appellant's sentence as "life without parole," but the judgment reflects appellant was sentenced to "life."

A person convicted of a capital felony in a case where the State does not seek the death penalty shall be imprisoned for life without parole if the person who committed the offense is eighteen years of age or older. PENAL §§ 12.31(b)(2); 19.03(b). Here, the State did not seek the death penalty, and appellant was thirty-one years old when he committed the offense. Thus, appellant's sentence is imprisonment for life without parole.

This Court has jurisdiction to rectify an error in sentencing. *Mizell v. State,* 119 S.W.3d 804, 805–806 (Tex. Crim. App. 2003). And Texas Rule of Appellate Procedure 43.2 allows this Court to modify the trial court's judgment and affirm it as modified. TEX. R. APP. P. 43.2. We sustain the State's cross issue and modify the judgment to reflect a sentence of life imprisonment without parole. TEX. R. APP. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992).

## CONCLUSION

We affirm the judgment as modified.

/Nancy Kennedy/
_____
NANCY KENNEDY
JUSTICE

Do Not Publish
Tex. R. App. P. 47

221119F.U05

–38–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CARRENDIUS WALKER,
Appellant

No. 05-22-01119-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District Court, Dallas County, Texas Trial Court Cause No. F19-76545. Opinion delivered by Justice Kennedy. Justices Garcia and Breedlove participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

to reflect appellant's sentence is life imprisonment without parole.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 27th day of March, 2024.